LAURA KVERNSTOEN v. DOCTORS NELSON AND NELSON
AND ANOTHER.[1]

February 20, 1942.

No. 33,087.

*Reynolds & McLeod,* for relators.
*Dell & Rosengren,* for respondent.

[1]Reported in 2 N. W. (2d) 560.

JULIUS J. OLSON, JUSTICE.

*Certiorari* to review an order of the industrial commission awarding compensation.

A recital of the facts is deemed helpful. Over a period of more than 13½ years Miss Kvernstoen was employed by Doctors Nelson and Nelson at Fergus Falls as a dental assistant and bookkeeper. She became incapacitated in December 1938 as the result of dermatitis. She consulted a physician there, who gave her skin tests to determine the cause of her eruptions. She continued to discharge her duties until October 1, 1939, when her affliction had progressed to such a stage as to result in temporary total disability.

In the performance of her work she was required to use numerous chemicals listed by her as follows: Formalin, creosol compound, wood alcohol, and mercury. She also used local anesthetics and synthetic porcelain in her work. The local anesthetics include different kinds of chemicals, metycaine, monocaine, butyn, benzocaine, and tutocaine, including rubbing alcohol. Her first medical examination took place December 14, 1938. She was then suffering with soreness around her fingernails. She had a rash on her neck and eyelids. There was puffiness and redness about the margin of her fingernails. Later the rash appeared on the back of her hands, the "inside of her elbows," the upper portions of her body, and also on her feet. She received treatment by her local doctor until shortly before October 1, 1939, when, upon his advice, she quit her work and went to the Mayo Clinic at Rochester. Then every fingernail was involved, some were even loosened, and pus exuded from the nails. Her local physician felt "definitely that something connected with this girl's employment had a definite bearing on the cause and progression" of her condition. His original diagnosis was "a chronic infection in and around the fingernails and dermatitis affecting the skin on other parts of her body." When away from her work her condition cleared, but when she went back there would be a recurrence. At the Mayo Clinic she was treated by Doctors Brunsting and Kierland. Dr. Brunsting's

diagnosis was that she was suffering from "subacute dermatitis or eczema." He thought that various factors might have contributed to her condition and that it was impossible specifically to "incriminate" any one of them to the exclusion of others, but that some factors must be suspected more than others. He listed as "pertinent" to her condition mercury and wood alcohol. He said that he used "patch tests," disclosing "positive reactions" in some degree to the following chemicals: "Mercuric chloride, potassium iodide, potassium arsenite, photographic developer, lysol, pure bakelite, metycaine." The appearance of her fingernails did not indicate a "fungus disease." He admitted that "eczema is a very puzzling condition, and it is difficult to relate the disease to any particular factor or factors. The reaction that we obtained that seemed to be most in line with the patient's contact with her work seemed to be most relevant. It was also noted in her history when away from work she cleared up, excepting possibly for the nails. * * * the reactions to metycaine, photographic developer, mercuric chloride, lysol, and bakelite seemed possibly pertinent." By testing the patient "to the most pertinent things, which seemed to develop with her story, and I have listed those, and alcohol was one of those," he was of the opinion that "whether it was mercury chloride or metallic mercury doesn't seem to me to make any difference," since "if one is sensitive to mercury she usually is sensitive to all forms of it." When wood alcohol comes in contact with the skin its effect is to remove "the fats from the skin, which causes small fissures and allows infection to enter, and that explained for me why there was this puzzling involvement of the nail." Where a person becomes "sensitive in one place on the skin to some particular irritant, the entire skin assumes that sensitivity in a matter of time." He was of the opinion "that a positive reaction indicates a capacity to show manifestation, providing contact with material is present." He thought "all those things" entered into the picture and explained her condition. It is interesting to note that nowhere in the evidence is there any suggestion that mercury or its derivatives or wood alcohol, if absent, would have caused petitioner's disease.

Relators challenge that portion of the industrial commission's finding that "said employe became disabled by reason of an occupational disease * * * due to contacting mercury and/or wood alcohol in the course of said employment and was contracted therein December 1, 1938." Their argument is that this "finding does not specify the disease afflicting" the employe and as such might be any "one of the 24 [occupational diseases] enumerated in the act, anything from anthrax to firemen's heart disease"; that this finding "cannot be construed as [a] finding that said disease was mercury and/or wood alcohol poisoning." They further assert that "there is no showing in the record that contact with mercury and/or wood alcohol can cause only mercury and/or wood alcohol poisoning to the exclusion of all other diseases." In this situation, so they claim, the commission's findings portray "utter indecision" and "inability to name the disease or to find or determine what the disease was, what its cause, its etiology or derivation happened to be." Also, that they "are entitled to know which of the listed diseases it is claimed they are liable for, both by pleadings and findings."

For the employe, it is said that the expression "and/or" is found most frequently in legal phraseology and "as best descriptive of its [the commission's] findings," and that the language indicates the existence of either or both mercury and wood alcohol poisoning as the cause or causes of petitioner's condition. Therefore, "if the record contains evidence supporting a finding either in the dual or singular expression, the award must be necessarily sustained."

Relators introduced no evidence, so for decision there are here only the following issues: (1) Does the evidence sustain the finding that petitioner's condition was caused by one or both of the elements found to have caused her disease; (2) are there other causes, not covered by the statute, contributing to the net result; and (3) if such there are, does liability follow when the compensable elements are but contributing causal factors to petitioner's ailment?

Petitioner's recovery depends upon whether she has brought herself within the provisions of Mason St. 1927, § 4327. In Funk v. Minnesota Mining & Mfg. Co. 192 Minn. 440, 441, 256 N. W. 889, and again in Malzac v. Salmio, 206 Minn. 430, 432, 433, 288 N. W. 837, the pertinent provisions of that section are quoted, so there is no need of again quoting them. Sufficient for our purpose is subdivision (9) thereof, which reads:

"For the purposes of this act only the diseases enumerated in column one, following, shall be deemed to be occupational diseases:

Column 1.

| Description of Diseases. | Description of Process. |
|---|---|
| * * * * * * | |
| 3. Mercury poisoning or its sequelae. | 3. Any process involving the use of mercury or its preparations or compounds. |
| * * * * * * | |
| 6. Poisoning by wood alcohol. | 6. Any process involving the use of wood alcohol or any preparation containing wood alcohol." |

1. Upon petitioner rested the burden of proof, "and she cannot rest a recovery merely on speculation or conjecture." Adler v. Interstate Power Co. 180 Minn. 192, 194, 230 N. W. 486. But if her proof "furnishes a reasonable basis for an inference that the injury was the cause" of her "ailment it is sufficient." 6 Dunnell, Dig. & Supp. § 10406, and cases under note 85.

2. Applying that rule to the facts in the instant case, the question is whether petitioner has met this burden. In Adler v. Interstate Power Co. 180 Minn. 192, 193, 194, 230 N. W. 486, the court had for consideration a question identical in principle to this case. There, petitioner's expert gave as his opinion that the workman "arrived at his death as a result of *probably* inhalation or

injection of some poisonous substances, presumably derived in some way or other from the destructive distillation of coal." (Italics supplied.) There, as here, the doctor "could not give the definite gas or poison or combination which brought the result; and it is true that he admitted under cross-examination that in reaching results there might be such a thing as conjecture or speculation." But the holding was that, inasmuch as the doctor's conclusion was not disputed and there was no question of his credibility (the same is true here), "in the practical administration of the compensation act the unassailed opinion of the doctor, with the uncontradicted circumstances attending supporting it, should be taken as a correct statement of the cause."

Is there any more uncertainty in this case than in the one cited? In substance, the medical testimony here is that there are several factors that cannot be excluded, except that some are more "suspected" than others. Also important, we think, is the fact that the doctor deemed both mercury and alcohol as used by petitioner in her daily work to be "pertinent" to her condition. That petitioner was suffering from a very serious skin ailment contracted in the course of her employment is not questioned. She showed reactions to both mercury and wood alcohol, both of which were used by her in the course of her work. These were very "pertinent factors," according to the conclusion of those who are experts in this field. Important, also, is the fact that in handling mercury petitioner would first grind it with a mortar and pestle and would then squeeze it in her hands into pellet forms, using free metallic mercury poured out of a flask. This, coupled with the fact that the effect of alcohol is to destroy the natural oil in the skin, thus causing "small fissures" and allowing "infection to enter," goes far to sustain the conclusion reached by her experts. In this situation, the chain of causation, having been found sufficient by those best qualified to form an opinion on the issue, cannot be said to be wanting here as a matter of law. According to Dr. Brunsting, these elements were, as to petitioner, "the most pertinent things, which seemed to develop with her story, and I have

listed those, and alcohol was one of those." His testimony may be summed up by saying that he found her condition to be due to exposure to mercury and alcohol and that when put to these tests she showed reaction to each of them. Medical science and the opinions formed by those who devote the efforts of a lifetime to it cannot in all cases be reduced to precise conclusions. Especially is this true where, as here, medical men are still groping in the twilight zone of research and experimentation. Since they have found a causal relation here between these chemical elements and their harmful effect upon petitioner, we hesitate to set up a legal barrier to what they have determined. Their finding that such evidence as we have here is sufficient to satisfy them as to the cause of petitioner's disease should likewise satisfy the requirements of the statute. The workmen's compensation act itself was a forward step and marked a new development in our law. We have repeatedly said that it should receive a broad and liberal construction in the interests of employes.

3. That there are other causes entering into petitioner's condition not covered by the statute must be conceded. Her doctors could not eliminate from the two chemical elements covered by the statute all the other ones with which she came in contact during the course of her work. So the problem is whether liability should fall upon her employers when other causes, in addition to the compensable elements recognized by statute, combine in bringing about her ailments.

If this were the ordinary case of accidental physical injury occurring suddenly and violently, we should have no trouble in affirming the award. Where, in principle, is the line to be drawn? Clearly, we think, the general purpose of the act is the same, for it provides that [§ 4327(1)] "disablement of an employe resulting from an occupational disease * * * shall be treated as the happening of an accident." This being so, what justification is there for drawing an arbitrary line against petitioner because she contracted this ailment instead of losing a finger or two, or suffering other violent physical harm, in the course of her work?

Her suffering and lack of capacity to render useful service in the line of her skilled employment constitute just as great a handicap as would be the case if she had lost several of her fingers. The best years of her life have been spent in this line of work. She has been injured to such an extent that no one can now foresee or foretell whether she will ever be sufficiently rehabilitated to resume the duties of the work to which she has applied her time and talents. Legal cause and its harmful effects having been shown by competent evidence, liability follows although other causes may have lent their aid. *Cf.* Susnik v. Oliver I. M. Co. 193 Minn. 129, 258 N. W. 23; 6 Dunnell, Dig. & Supp. § 10397, and cases cited.

4. We do not regard relators' claim that the commission's findings are so inadequate as to require reversal because "mercury and/or wood alcohol poisoning" are not found in that exact terminology. Implicit in the language chosen, *viz.,* "that said disease was due to contacting mercury and/or wood alcohol," is the conclusion that those elements brought about "mercury and/or wood alcohol poisoning."

Petitioner is allowed $100 attorneys' fees, plus statutory costs and disbursements.

Writ discharged and order affirmed.