## ROBERT J. GRAY v. CITY OF ST. PAUL.

84 N. W. (2d) 606.

July 12, 1957—No. 37,019.

222

*Marshall F. Hurley,* Corporation Counsel, and *Robert E. O'Connell,* Assistant Corporation Counsel, for relator.

*Arnold M. Bellis* and *Robins, Davis & Lyons,* for respondent.

NELSON, JUSTICE.

Certiorari for review of decision of the Industrial Commission. The

respondent, Robert J. Gray, filed a petition for compensation and benefits under our Workmen's Compensation Act, M. S. A. c. 176, by virtue of having contracted the disease of tuberculosis from a fellow police officer with whom he worked while in the employ of relator, the city of St. Paul.

Gray was first employed by the police department of St. Paul in July 1949. During the year of 1951 Gray and a fellow police officer were in contact with each other in the course of their duties as police officers. It appears from the record that on eight separate occasions during that year they did squad-car patrol duty together and on each of those occasions they worked on eight-hour shifts, riding together in the same squad car. The last occasion of their working together was on November 19, 1951. On December 4, 1951, the fellow police officer with whom Gray had shared the same squad car on patrol duty was hospitalized and it was later determined that he was suffering from a reactivated case of tuberculosis. Although it would appear from the record that Gray had some contacts with his fellow police officer during off-duty hours, yet the medical experts are agreed that the contacts between Gray and this fellow police officer on those eight occasions when they did squad-car duty together were the exposure periods which resulted in Gray's contracting tuberculosis. Gray was hospitalized for active pulmonary tuberculosis on February 19, 1954, at the Veterans Administration hospital. A segmental resection was performed on him and after convalescence he returned to duty with the police department. After hearings, the referee of the Industrial Commission awarded compensation to Gray in the amount of $1,785 with interest and directed the city to pay the Veterans Administration hospital for charges incurred the sum of $6,501.75, as well as other outstanding medical charges incurred. Later, the Industrial Commission filed its decision affirming the referee. The decision was unaccompanied by a memorandum. Relator now seeks a reversal of the decision of the Industrial Commission on the ground that it is contrary to law.

The facts do not appear to be in dispute. Gray, however, stresses the fact that the fellow police officer from whom he contracted tuberculosis was himself suffering from a reactivated and far-advanced case of tuberculosis during all of the eight-hour shifts that the two men

worked together on squad-car duty between August 20 and November 19, 1951.

The question involved here is whether a police officer employed by the city of St. Paul is entitled to receive compensation and benefits under the Workmen's Compensation Act from his employer for having contracted a communicable disease, tuberculosis, while in said employ from a fellow officer and employee, who from time to time occupied the same squad car with him in doing patrol duty.

We are chiefly concerned here with § 176.011, subds. 15 and 16, of the Minnesota Workmen's Compensation Act. Subd. 15 reads as follows:

" 'Occupational disease' means a disease arising out of and in the course of employment peculiar to the occupation in which the employee is engaged and due to causes in excess of the hazards ordinary of employment and shall include undulant fever. Ordinary diseases of life to which the general public is equally exposed outside of employment are not compensable, except where such diseases follow as an incident of an occupational disease, or where the exposure peculiar to the occupation makes such disease an occupational disease hazard. A disease arises out of the employment only if there be a direct causal connection between the conditions under which the work is performed and if the occupational disease follows as a natural incident of the work as a result of the exposure occasioned by the nature of the employment. An employer is not liable for compensation for any occupational disease which cannot be traced to the employment as a direct and proximate cause and is not recognized as a hazard characteristic of and peculiar to the trade, occupation, process, or employment *or which results from a hazard to which the workman would have been equally exposed outside of the employment.* If immediately preceding the date of his disablement or death, an employee was employed on active duty with an organized fire department of any municipality and his disease is that of myocarditis, coronary sclerosis, pneumonia or its sequel, and at the time of his employment such employee was given a thorough physical examination by a licensed doctor of medicine, and a written report thereof has been made and filed with such organized fire department, which examination and report negatived any evidence of myo-

carditis, coronary sclerosis, pneumonia or its sequel, the disease is presumptively an occupational disease and shall be presumed to have been due to the nature of his employment." (Italics supplied.)

Subd. 16 reads as follows:

" 'Personal injury' means injury arising out of and in the course of employment and includes personal injury caused by occupational disease; but does not cover an employe except while engaged in, on, or about the premises where his services require his presence as a part of such service at the time of the injury and during the hours of such service. Where the employer regularly furnished transportation to his employes to and from the place of employment such employes are subject to this chapter while being so transported, but shall not include an injury caused by the act of a third person or fellow employe intended to injure the employe because of reasons personal to him, and not directed against him as an employe, or because of his employment."

Section 176.011, subd. 9, provides:

" 'Employee' means any person who performs service for another for hire; and includes an alien, a minor, a sheriff, deputy sheriff, constable, marshal, policeman, fireman, an executive officer of a corporation, and a peace officer while engaged in the enforcement of peace or in and about the pursuit or capture of any person charged with or suspected of crime; * * *."

■ The city contends that our Workmen's Compensation Law expressly prohibits an award of compensation to an employee who has contracted a disease from a fellow employee (here—tuberculosis, a communicable disease) which disease is recognized as an ordinary disease of life to which the general public is equally exposed outside of employment, except (1) where such diseases follow as an incident of an occupational disease or (2) where the exposure peculiar to the occupation makes such disease an occupational hazard.

Gray argues that § 176.011, subd. 15, in defining the term "occupational disease," makes no distinction whatsoever between "communicable diseases" and "other diseases." He contends that Minnesota's occupational disease law is broad enough to cover any disease which

arises out of and in the course of employment peculiar to the occupation in which the employee is engaged *and which is due to causes in excess of the hazards of ordinary employment,* and that nowhere does there appear in the statutory definition of occupational diseases any distinction based upon communicable, as opposed to other types of diseases. He further contends that by the very definition which the legislature uses to define occupational diseases, even ordinary diseases of life may be occupational because in the definition (§ 176.011, subd. 15) the legislature does not prohibit ordinary diseases of life, but only ordinary diseases of life *to which the general public is equally exposed outside of employment;* that therefore a so-called ordinary disease might very well be occupational if it meets the other requirements of the definition and if it can be shown that the general public was not equally exposed outside of the employment to the particular disease under consideration. With this contention, we agree. Kvernstoen v. Nelson, 212 Minn. 102, 2 N. W. (2d) 560; Sinclair v. Frye, 18 Minn. W. C. D. 93.[1]

■ Following the amendment of our compensation act by L. 1943, c. 633, eliminating the former classification and specific listing of the diseases considered occupational, this court in Hunter v. Zenith Dredge Co. 220 Minn. 318, 19 N. W. (2d) 795, and in Sandy v. Walter Butler Shipbuilders, Inc. 221 Minn. 215, 21 N. W. (2d) 612, said, in defining occupational diseases, that under the present statutory definition ordinary diseases of life to which all members of the general public are equally exposed outside of the employment are not compensable, *but an exception is to be recognized as regards said ordinary diseases where they follow as an incident to an occupational disease, or where the exposure peculiar to the occupation makes of such disease an occupational*

---

[1]Section 176.021, subd. 1, provides that:

"Except as excluded by this chapter all employers and employes are subject to the provisions of this chapter. Every such employer is liable for compensation according to the provisions of this chapter and is liable to pay compensation in every case of personal injury or death of his employe arising out of and in the course of employment without regard to the question of negligence, unless the injury or death was intentionally self-inflicted or when the intoxication of the employe is the proximate cause of the injury. The burden of proof of that fact is upon the employer."

*disease hazard.* By the aforesaid amendments of 1943, the legislature provided that to establish an occupational disease, the evidence must disclose (1) that it arose *out of and in the course of the employment;* (2) *that it was peculiar to the occupation in which the employee was engaged; and* (3) *that it was due to causes in excess of the ordinary hazards of employment.*

■ This court in both the Hunter and Sandy cases, refers to certain cases in Connecticut, under a statute somewhat similar to ours, in regard to making occupational diseases compensable in workmen's compensation, quoting with approval from Glodenis v. American Brass Co. 118 Conn. 29, 170 A. 146, and from LeLenko v. Wilson H. Lee Co. 128 Conn. 499, 24 A. (2d) 253. In the Glodenis case the court held that (118 Conn. 40, 170 A. 150):

"* * * To come within the definition an occupational disease must be a disease which is a natural incident of a particular occupation, and must attach to that occupation a hazard which distinguishes it from the usual run of occupations and is in excess of that attending employment in general," and that

"* * * The phrase 'peculiar to the occupation' is not here used in the sense that the disease must be one which originates exclusively from the particular kind of employment in which the employee is engaged, but rather in the sense that the conditions of that employment must result in a hazard which distinguishes it in character from the general run of occupations; * * *."

The Connecticut court likewise enlarged upon the construction of their occupational disease statute, which is similar to ours, in the Le-Lenko case as follows (128 Conn. 505, 24 A [2d] 256):

"* * * When we referred in them to disease as being a 'natural' incident of the employment, we used that word in the sense that we have used it in defining proximate causation; * * * it imports not a forward look to determine what risks should have been foreseen, but a tracing back from the results to the circumstances out of which the disease sprang. * * * If, so traced, a disease is a natural result of conditions which are inherent in the employment and which attach to that employment a risk of incurring it in excess of that attending employment in

general, an award of compensation is not precluded because the risk is one which has not become generally recognized or because only employees unusually susceptible will suffer from the disease."

■ This court in Sandy v. Walter Butler Shipbuilders, Inc. 221 Minn. 215, 221, 21 N. W. (2d) 612, 616, said that:

*"The obvious purpose of the 1943 act was to broaden the scope and enlarge the field within which such occupational risks were to be covered. We think the logical conclusion to be drawn is that the provision 'arising out of and in the course of employment peculiar to the occupation in which the employee is engaged* and due to causes in excess of the hazards ordinary of employment' refers to the hazards to which plaintiff was exposed in doing his work. Were this not so, it would be difficult to find an adequate reason for the adoption of the statute. And that was the conclusion reached in Glodenis v. American Brass Co. 118 Conn. 29, 40, 170 A. 146, 150, where a similar question arose under a statute very similar to our own." (Italics supplied.)

We have said time and again that the compensation law is remedial, and, as such, should be given a liberal interpretation to the end that its purposes may thereby be attained. Sandy v. Walter Butler Shipbuilders, Inc. *supra;* also, see, Markham v. Cabell, 326 U. S. 404, 66 S. Ct. 193, 90 L. ed. 165; Oleson v. Bergwell, 204 Minn. 450, 283 N. W. 770.

■ The city cites decisions from other states, but these are based on statutory provisions differing from ours. It may be true that the precise question has not heretofore been passed on by this court, but the course laid out and defined in the Hunter and Sandy cases indicates approval of the approach to the present situation which both the referee and the Industrial Commission adopted.

In the case of Mills v. Detroit Tuberculosis Sanitarium, 323 Mich. 200, 35 N. W. (2d) 239, it was held that whether a disease is compensable must be determined on the basis of the particular facts involved. In that case plaintiff had been employed in the Detroit Tuberculosis Sanitarium. He had contracted tuberculosis. The petition filed set forth that the disability for which compensation benefits were sought resulted from a personal injury or a compensable disease and that such disability was caused by pulmonary tuberculosis. The sanitarium de-

nied that the plaintiff had suffered any compensable disability arising out of and in the course of his employment. Compensation was awarded plaintiff and the sanitarium appealed, contending that pulmonary tuberculosis is an "ordinary disease of life," and the Michigan court said that (323 Mich. 208, 35 N. W. [2d] 242) "In the common acceptance of the term, we think it must be so regarded"; that "It is a matter of common knowledge that it is widespread, and that it is not limited to any particular class of individuals nor to specific localities. Illness and death resulting from it are common." There was medical testimony to the effect that it is an ordinary disease of life as the expression is generally used. The Michigan court, however, held that (323 Mich. 208, 35 N. W. [2d] 242):

"From the conclusion that tuberculosis may be regarded generally as an ordinary disease, it does not necessarily follow that disability resulting therefrom is not under any circumstances compensable under the Michigan statute. It will be noted that the statute does not place all ordinary diseases in a noncompensable class, but, rather, those 'to which the public is generally exposed outside of the employment.' *The evidence in this case indicates that the plaintiff was exposed in his employment to the risk of contracting tuberculosis in a far greater degree and in a wholly different manner than is the public generally*. The testimony of Dr. Howes, above quoted in part, suggests that merely casual exposure to tubercle bacilli will not result in contracting pulmonary tuberculosis. Under the proofs here, it cannot be said that the public is 'generally exposed' to the disease to the extent required to contract it. The record here does not disclose that plaintiff was brought in contact with any definite source of tubercle bacilli outside of his employment." (Italics supplied.)

The Mills case indicates that the Michigan Workmen's Compensation Law had provisions similar to ours in the following terminology (323 Mich. 207, 35 N. W. [2d] 242):

"The term 'personal injury' shall include a disease or disability which is due to causes and conditions which are characteristic of and peculiar to the business of the employer and which arises out of and in the course of the employment. Ordinary diseases of life to which

the public is generally exposed outside of the employment shall not be compensable."

The Michigan court held that the findings of fact made by the commission with reference to plaintiff's disability and the manner in which he contracted the disease were supported by evidence and were in consequence binding on the court and affirmed the award of the compensation commission.

■ Board of National Missions v. Alaska Industrial Board (D. Alaska) 116 F. Supp. 625, involved a proceeding under the Alaska Workmen's Compensation Act. Claimant alleged that he had contracted tuberculosis arising out of and in the course of his employment as an employee pastor, either as an accidental injury by reason of his contacts with persons suffering from active tuberculosis, or as an occupational disease due to conditions peculiar to his employment. The Alaska board held that his claims were supported by substantial evidence and on appeal it was held that these findings were binding on the court. The Alaska Workmen's Compensation Act authorizes compensation for any (116 F. Supp. 626):

" 'Injury by accident arising out and in the course of employment, including any disease proximately caused by the employment, which is due to causes and conditions that are characteristic of and peculiar to a particular trade, occupation, process or employment, and to exclude (sic) all ordinary diseases of life to which the general public are exposed.' * * *

"The Board found

" 'That the applicant contracted the disease of tuberculosis arising out of and in the course of his employment, either as an accidental injury due to the invasion of the tuberculosis germs by reason of his contact with persons proved to have been suffering from active tuberculosis, or in the alternative, as an occupational disease due to conditions peculiar to his employment as missionary pastor at Metlakatla which caused him to be exposed to the disease to a greater extent than is the general public.' "

On appeal it was contended that tuberculosis did not come within the Alaska Workmen's Compensation Act because it is neither an in-

jury by accident nor an occupational disease but is rather an ordinary disease of life to which the general public is exposed and hence is non-compensable. Support may be found for the proposition that the contraction of tuberculosis in certain cases might be an injury by accident. The court in that case said (116 F. Supp. 627):

"Although support may be found for the proposition that the contraction of tuberculosis in this case might be an injury by accident, Larson, Workmen's Comp. Law, Sec. 38.80-38.83, 40.30, 42.00 et seq., either on the theory of unusual exposure, Libby, McNeil & Libby v. Alaska Industrial Board and Chutuk, 11 Alaska 327, or unexpected result, Industrial Commission v. Corwin Hospital, 126 Colo. 358, 250 P. 2d 135; Goldberg v. 954 Marcy Corp., 276 N. Y. 313, 12 N. E. 2d 311, it is not necessary to discuss this point because in my opinion the authorities sustain the proposition that, under facts of the kind here dealt with, tuberculosis is an occupational disease."

That court also quoted with approval Mills v. Detroit Tuberculosis Sanitarium, *supra,* in support of its conclusions. The court further said that (116 F. Supp. 628):

"* * * It would appear, therefore, that tuberculosis may be compensable if it is either an injury by accident and causally related to the employment or an occupational disease," citing Women's Division of Christian Service v. Alaska Industrial Board, 13 Alaska 166.

The court finally concluded that under the facts the plaintiff's tuberculosis must be held to be an occupational disease, citing Bondar v. Simmons Co. 23 N. J. Super. 109, 92 A. (2d) 642, and Stepnowski v. Specific Pharmaceuticals, Inc. 18 N. J. Super. 495, 87 A. (2d) 546, for a statement of the better reasoned view.

It has been stressed by the employee in particular that his disability was brought about by the manner in which he was required to work in a squad car together with a fellow officer suffering from reactivated tuberculosis, which was peculiar to his occupation in that respect and different from and in excess of the ordinary hazards of employment and different from the exposure to the ordinary communicable diseases of life to which the general public is equally exposed outside of employment. Ordinarily the members of the general public

would not be equally exposed to reactivated tuberculosis in the manner in which employee was exposed to it in traveling with his fellow officer on squad car duty. There is no evidence in the record whatsoever to support a finding that his disability was due to other causes. No other cause was presented. He was not affected with any diseases or disorders prior to beginning his work here involved. Under the circumstances disclosed by the record herein to hold that Gray's disability was due to some cause not arising out of his occupation would be to resort to speculation and conjecture and close our eyes to the undisputed facts. That Gray's tuberculosis being peculiar to his occupation in the sense that he was exposed to a hazard different in character from that encountered in employment in general may be clearly gleaned from Dr. Raymond W. Scallen's testimony as follows:

"Q. Will you evaluate for us, Doctor, your opinion of the relative significance of the different types of contact between the two men?

"A. Well, a chance meeting, persons standing next to each other, always presents the possibility of transmission of infection occurring at that time. But taking that as compared with close contact, close proximity of two persons within an enclosed or semi-enclosed environment where there is opportunity for repeated inoculation of the air and the atmosphere in which each person is breathing, the opportunity and probability of infection is far greater under the latter circumstances; in fact, it is so great that when we find a situation like that, where a person has prolonged and repeated exposure, we sometimes refer to it as superinfection, meaning that they get probably, and of necessity, a larger inoculum or number of organisms than is usual.

"Q. Would the eight periods of 8-hour shifts that the two men performed together in a closed or semi-enclosed vehicle, would that in your opinion constitute what you term almost superinfection?

"A. Yes, I believe so.

"Mr. O'Connell: You used the term 'possibility of infection'?

"The Witness: I used the term 'probability,' sir.

       *    *    *    *    *

"Mr. O'Connell:

"Q. On any of the occasions, Doctor, where the two men were in close proximity to each other, and where they had a discussion that

lasted over a period of time, say more than a few minutes, you would then have the opportunity for massive exposure, would you not?

"A. You would have the opportunity of exposure, yes, but I wouldn't characterize that as massive exposure.

"Q. Well, that's then contrary to your testimony that you could have a massive exposure from contact of two individuals, one a carrier, on a single occasion?

"A. Well, I don't think we agree, Counsel, as to what I meant by that. I said that I felt the possibility of transmission from one person to another on a transitory or brief contact always exists, but for having massive exposure requires a considerable length of time and considerable length of opportunity to have this exposure made to the patient and have him receive it, and I wouldn't characterize it as transitory or a matter of a few minutes' exposure of one patient to another as massive.

"Q. Well, assuming we sat together for a matter of, say—I'm referring to an individual capable of transmitting disease and an individual who may be subject to receiving the disease, where two such individuals are carrying on a conversation in close proximity to each other for a period of let's say half an hour, would you not then have the opportunity for massive exposure?

"A. Well, this gets down once again to the definition of massive, and my definition of massive is that that would be an excellent opportunity of exposure, but I still wouldn't put a definition of massive exposure on that particular length of time. That's the function of so many things, sir; the number of organisms the other patient might be bringing up, and as I say, the duration of the period of exposure—it's very difficult to be didactic on that point."

■ Can it be successfully contended that employee's contraction of the disease of tuberculosis under the circumstances involved in the squad-car patrol duties was not due to causes in excess of the ordinary hazards of employment and constituted an exposure on his part to the disease which was greater than and different in character from the exposure of the general public. We think the facts here present a situation where an exception exists wherein the disease of tuberculosis resulted from exposure peculiar to the occupation and differing from the

exposure of the general public makes such disease an occupational disease hazard. A disease may become occupational when contracted in employment by reason of hazards to which employees generally are not equally exposed. It is not the ordinariness of a disease which makes it nonoccupational; rather it is whether the public is equally exposed to the hazard of the disease outside of the employment. Here the conditions of the employment proximately caused Gray to become infected with tuberculosis and therefore his disease was under the circumstances and in fact a natural incident of his employment. It was the special work environment differing from the ordinary exposure on the part of policemen wherein lay a hazard of contracting the disease far in excess of the hazard to which the ordinary policeman employee may be exposed. Since we think that this was a hazard distinguishable in character from the general run of occupations or that of the policeman ordinarily, therefore officer Gray's tuberculosis as contracted was in fact "peculiar to his occupation."

■ It might be given consideration here that amendment of our compensation act by L. 1943, c. 633, saw the elimination from our statutes of the former classification and listing of those diseases which the legislature had earlier considered advisable. The purpose and intent of the legislature must have been to liberalize the approach in consideration of occupational diseases intending to cover those (1) arising out of the employment, (2) where there is found to be a direct causal connection between the conditions under which the work is performed and the disease, and (3) that if the disease follows as a natural incident of the work and as a result of the exposure occasioned by the nature of the employment, it may be classed as an occupational disease.

The city contends that the legislature did not intend by the enactment of the occupational disease provisions to provide a general system of health insurance. While generally that may be admitted, we think it clear that the legislature has been in accord with this court's interpretation of the occupational disease provisions of our Workmen's Compensation Law as announced both in the Hunter and Sandy cases which provide and establish a liberal construction of those provisions. Legislative acquiescence therein has resulted in constituting our present

occupational disease provisions free from further amendments since the advent of the Hunter and Sandy cases. The city argues that, if what employee contends for is true, there can be no sound reason for the enactment of L. 1955, c. 340, now §§ 251.051 to 251.053, the pertinent part of which reads that: "Any police officer of the state or of any county or municipal subdivision of the state whose duties within the scope of his employment as a police officer bring him in contact or did bring him in contact with persons afflicted with tuberculosis, which said police officer contracts or becomes ill from tuberculosis, shall be entitled to the medical care and compensation provided for by this chapter. 'Contracts tuberculosis' shall be construed to mean the development of demonstrable tuberculosis in the police officer."

The fact that the foregoing provision was enacted by the legislature providing police officers protection in contracting tuberculosis while acting as such within the scope of their employment is not controlling of the decision law in this state which holds that it is not required that a disease to be within the definition of an occupational disease should be one which arises solely out of the particular kind of employment in which the employee is engaged, but that it is enough if it is due to causes in excess of the ordinary hazards of that particular kind of employment. That the contraction of tuberculosis may come within the definition of an occupational disease if under the factual situation at the time it is a disease which is a natural incident of a particular occupation and attaches to that occupation a hazard which distinguishes it from the usual run of occupations and is in excess of that attending employment in general.

This court's scope of review of a decision of the Industrial Commission by means of certiorari is fully stated in 21 Dunnell, Dig. (3 ed.) § 10426, and cases therein cited. We have observed the rule that the findings of the Industrial Commission on fact questions will not be disturbed unless consideration of the evidence with permissible inferences which may be drawn therefrom compels or requires reasonable minds to adopt contrary conclusions. See, Chillstrom v. Trojan Seed Co. 242 Minn. 471, 65 N. W. (2d) 888; Corcoran v. P. G. Corcoran Co. Inc. 245 Minn. 258, 71 N. W. (2d) 787.

We have come to the conclusion that the commission, having found

the facts as it did, must be affirmed and that employee is entitled to the compensation awards as made. Employee is allowed $250 attorney's fees in this court.

Affirmed.