JOSEPHINE MEYER v. A. B. McMAHAN COMPANY,
INCORPORATED, AND ANOTHER.

130 N. W. (2d) 46.

July 31, 1964—No. 39,233.

*Robb, Robb & Van Eps,* for relators.

*Robins, Davis & Lyons, Arnold M. Bellis,* and *George Latimer,* for respondent.

THOMAS GALLAGHER, JUSTICE.

Certiorari to review a decision of the Industrial Commission wherein respondent, Josephine Meyer, as widow of Earl J. Meyer, was awarded compensation for his temporary, total disability from April 11, 1960, to October 7, 1960, due to an occupational disease; for benefits arising from his death due to such disease on October 7, 1960; and for medical and hospital expenses incurred by him prior thereto.

The award was based upon the commission's finding that between August 1945 and April 11, 1960, during which time decedent was in the employ of relator A. B. McMahan Company, Inc., he had contracted a lung disease—pulmonary fibrosis—which arose out of such employment and compelled termination thereof on April 8, 1960, and which occasioned his death on October 7, 1960.

On appeal relators contend that (1) the evidence was insufficient to sustain the commission's finding that decedent's disability and death were due to an occupational disease arising out of his employment; (2) the evidence compelled a finding that respondent was voluntarily

living apart from decedent and was not wholly dependent upon him at the time of his disability and death; and (3) the commission erred in denying a petition to bring in for apportionment purposes the compensation insurers who had carried the employer's compensation risks for certain years of decedent's employment, during which he may have contracted the described occupational disease.

The record establishes that throughout his employment by A. B. McMahan Company, Inc., decedent was required to use various chemical substances beyond threshold limits of safety in connection with his work. It was the opinion of a number of medical experts who testified in respondent's behalf that this led to decedent's ultimate disability and death. These substances were as follows:

*Cadmium Oxide*—in powder form.

*Sodium Cyanide*—in pellet form (may create heat and mist and change to hydrogen cyanide of deadly effect).

*Sodium Hydroxide*—in pellet form.

*Nitric Acid*—volatizes quickly.

*Sulphuric Acid*—volatizes less quickly.

*Muriatic Acid, Hydrochloride Acid, and Sodium Hypochlorate*—volatile (heavier than air—maintains toxic properties).

*Trichlorethylene*—vaporizes quickly.

*Beryllium Powder and Beryllium*—used up until sometime in 1956.

There was evidence that the use of many of these chemicals created a hazardous condition as to decedent's health, and that he had been frequently cautioned with reference thereto.

During the employment described, the various insurers which bore the employer's compensation risks were as follows:

January 1, 1945, to January 1, 1950—Liberty Mutual Insurance Company.

January 1, 1950, to January 1, 1955—Hartford Accident and Indemnity Insurance Company.

January 1, 1955, to January 1, 1956—American Automobile Insurance Association.

January 1, 1956, to January 1, 1957—Travelers Insurance Company.

January 1, 1957, to termination of decedent's employment—Bituminous Casualty Corporation (relator).

With respect to respondent's dependency on and involuntary separation from decedent prior to his death, the record establishes the following: These parties were married on May 9, 1940. Two children were born of this marriage—John on June 21, 1941, and Camille on September 20, 1942. In 1946 or 1947, after decedent had commenced working for employer-relator, he developed a drinking problem and to a great extent failed to support his family. In 1948 he went to Seattle and while there failed completely to support his wife and children so that respondent was forced to seek public assistance. In 1949 he returned from Seattle, and shortly thereafter respondent instituted proceedings against him for nonsupport. Therein he was placed on probation by the District Court of Ramsey County which ordered him to turn over his salary checks for the benefit of his wife and children. He was released from this probation in 1950 but then resumed his excessive drinking, accompanied by failure to support his family. To maintain her home and to provide for her children, respondent obtained employment in 1952 and 1953. In December 1954 decedent left the home of the parties and from then on refused to have any association with his family. At various times thereafter respondent urged him to seek medical relief for his alcoholism which he refused to do.

In November 1954 he was admitted to Ancker Hospital in St. Paul as an inebriate. That same month, at the insistence of the Ramsey County Welfare Board and Family Service, respondent commenced an action in the District Court of Ramsey County against him for separate maintenance and support. In May 1955 in this action he was ordered to pay $22 per week to respondent as support for his family. Since then until his hospitalization, he made weekly payments to respondent in compliance with this order; and thereafter no further action was taken by her in the district court proceedings. At no time did she forbid or prevent his occupancy of the home of the parties. When he entered the hospital in 1960 he called her to inform her of his hospitalization and of his inability to continue the monthly payments described. Thereafter she visited him at the hospital two or three times

weekly until his death. Prior thereto she had been compelled to seek outside employment to supplement the weekly payments required of decedent so that the payments upon the homestead of the parties might be kept up.

■ The evidence overwhelmingly supports the commission's finding that the decedent's disability and death were due to an occupational disease contracted while in the employ of employer-relator. Dr. R. James McClellan testified that an autopsy performed upon decedent disclosed pulmonary fibrosis with fibrous pleura adhesions over a large portion of both of his lungs. He testified further that certain needle-like clefts found on decedent's lungs caused him to conclude that the condition found was due to decedent's exposure to the large number of irritants, caustics, and toxic material with which he had come in contact in his employment. Dr. Arnold H. Joseph testified that decedent's disability and death were due to pulmonary fibrosis caused by his inhalation of the fumes arising from the chemicals to which he had been exposed in his work for employer-relator. Dr. George C. Roth testified that he had examined decedent on the day before his death and had then found that he had a "clubbing of the fingers," indicative of insufficient oxygen in the blood and caused by a pulmonary disease; that he had then found decedent suffering from fibrosis of the lungs which in his opinion had resulted from decedent's exposure to the various chemicals with which he worked in his employment and which definitely could have caused the destruction of the lung tissue and led to the disease which caused his disability and death. He further expressed the opinion that the various acids to which decedent had been exposed in his work were all of equal importance in causing the disease described—that no one of them was more apt than the other to cause it. Each of these medical experts testified that in his opinion decedent's exposure to beryllium or to certain derivatives thereof up until sometime in 1956 could not have been the cause of his later disability or death as relators contend.

Dr. Leslie W. Foker, called by relators, admitted that, aside from the beryllium to which decedent had been exposed, many of the other chemicals with which he had come in contact in his work were toxic

and destructive of lung tissue; that a very small concentration of cadmium oxide would adversely affect the respiratory system and injure human tissue; that continuous exposure to a small concentration of hydrofluoric acid could cause severe inflammation of the respiratory tract and result in pneumonitis or inflammation of the lungs; and that trichlorethylene and carbon tetrachloride would likewise have an injurious effect upon the lungs. He would not concede that 15 years of heavy exposure to such irritants could produce fibrosis, disagreeing with the medical experts of respondent on this issue.

As we have indicated on a number of occasions (Gray v. City of St. Paul, 250 Minn. 220, 84 N. W. [2d] 606; Hiber v. City of St. Paul, 219 Minn. 87, 16 N. W. [2d] 878; Kvernstoen v. Nelson, 212 Minn. 102, 2 N. W. [2d] 560), the commission in determining the cause of disability or disease under the Workmen's Compensation Act may reject opinions of some medical experts with respect thereto and rely upon those of others testifying in opposition; and in making its finding thereon consider such testimony in relationship to all the surrounding facts and circumstances. Jurich v. Cleveland-Cliffs Iron Co. 233 Minn. 108, 46 N. W. (2d) 237; Richter v. Shoppe Plumbing & Heating Co. 257 Minn. 108, 100 N. W. (2d) 96; Ulve v. Bemidji Cooperative Creamery Assn. 267 Minn. 412, 127 N. W. (2d) 147. It would follow that on the evidence above referred to this court has no choice but to affirm the commission's finding that decedent's exposure to the chemicals described in his work gave rise to an occupational disease designated as pulmonary fibrosis which ultimately caused his disability and death.

■ Relators contend that respondent did not establish her claim of total dependency under Minn. St. 176.111, subd. 1(a),[1] and that the evidence compelled a finding that because she had instituted an action against decedent for separate maintenance sometime before his death

---

[1]Minn. St. 176.111, subd. 1, provides in part: "For the purposes of this chapter the following persons are conclusively presumed to be wholly dependent:

"(a) wife, unless it be shown that she was voluntarily living apart from her husband at the time of his injury or death."

her separation from him had been voluntary and hence entitled her only to a proportionate amount of the compensation as provided for under § 176.111, subds. 4 and 5,[2] and § 176.111, subd. 17.[3] An examination of the record, and particularly respondent's testimony as outlined above, establishes that there was substantial evidence to support the commission's finding that her separation from decedent had not been voluntary and accordingly that she was entitled to the total dependency benefits provided for under § 176.111. The only evidence submitted in opposition to her testimony was in the form of an affidavit made by decedent in 1954 in connection with a hearing in the separate maintenance proceeding above described. Therein he averred that his reason for leaving his domicile at that time was respondent's threatening and abusive conduct. Respondent's testimony certainly established that it was only at the insistence of the welfare authorities of Ramsey County that she instituted that action. The fact that decedent was then placed upon probation and required under penalty of imprisonment to pay a portion of his salary to her would be strong evidence of the involuntary nature of her actions in bringing about the separation. Thus, she testified:

"I didn't want to break up the home. I tried to reason with him, but you can't with a drinking man. So I went to work in the year 1952

[2]Minn. St. 176.111, subd. 4, provides: "Any member of a class named in subdivision 3 [includes wife] who regularly derived part of his support from the wages of a deceased worker at the time of his death and for a reasonable time prior thereto is considered his partial dependent and compensation shall be paid to such dependents in the order named."

Minn. St. 176.111, subd. 5, provides: "In death cases compensation payable to dependents is computed on the following basis and shall be paid to the persons entitled thereto or to a guardian or such other person as the commission directs for the use and benefit of the person entitled thereto."

[3]Minn. St. 176.111, subd. 17, provides: "Partial dependents are entitled to receive only that proportion of the benefits provided for actual dependents which the average amount of wages regularly contributed by the deceased to such partial dependents at the time of and for a reasonable time immediately prior to the injury bore to the total income of the dependent during the same time * * *."

and 1953 * * *. He was very bitter and for two years he didn't come home after work at all. Just to sleep. He was with his drinking friends and I put up with that while I worked.

\* \* \* \* \*

"* * * We were happy when he was not drinking, but when he was drinking it was a big problem.

"Q. * * * When you learned that this order was issued and your husband started paying you $22.00 a week, were you willing to have your husband live at home with you?

"A. Yes, I was willing, but he was bitter. He wasn't willing."

Her testimony with respect to decedent's alcoholism was substantiated by other evidence submitted at the hearing, including records of the hospital where he had been confined which disclosed that he had been admitted as an inebriate. As this court stated in State ex rel. George J. Grant Const. Co. v. District Court, 137 Minn. 283, 285, 163 N. W. 509:

"* * * the expression 'voluntarily living apart from her husband,' * * * means, and should be construed to mean, the free and intentional act of the wife uninfluenced by extraneous causes or, as it might be otherwise expressed, her choice deliberately made and acted upon."

See, also, State ex rel. London & L. Ind. Co. v. District Court, 139 Minn. 409, 166 N. W. 772; Hinchuk v. Swift & Co. 149 Minn. 1, 182 N. W. 622; Conway v. County of Todd, 187 Minn. 223, 244 N. W. 807. There being adequate evidence to support the commission's finding on this issue, it is affirmed.

■ Insurer-relator contends that the commission erred in denying a petition before hearing to bring in as additional parties for apportionment purposes the prior compensation insurers of the employer, each of which had borne the employer's compensation risks for certain years of decedent's employment during which he may have contracted the occupational disease resulting in his disability and death.

We do not feel that the commission's order denying such petition would nullify insurer-relator's right to proceed under § 176.66, subds.

5 and 6.[4] While under this statute the right to apportionment appears to apply only against prior *employers* shown to have engaged an employee since his contraction of an occupational disease, this court in a number of decisions has held that where the compensation act extends rights or benefits to *employers* as a class, such rights or benefits inure to the respective compensation insurers of such employers under well-established principles of subrogation. Hartford Acc. & Ind. Co. v. Schutt Realty Co. 210 Minn. 235, 297 N. W. 718; Standard Acc. Ins. Co. v. Minnesota Utilities Co. 207 Minn. 24, 289 N. W. 782; Fidelity & Cas. Co. v. St. Paul Gas Light Co. 152 Minn. 197, 188

---

[4]Minn. St. 176.66, subd. 5, provides: "The total compensation due for occupational disease is recoverable from the employer who last employed the employee in the employment to the nature of which the disease was due and in which it was contracted. If such disease was contracted while such employee was in the employment of a prior employer, the employer who is made liable for the total compensation * * * may appeal to the commission for an apportionment of such compensation among the several employers who, since the contraction of such disease, employed such employee in the employment to the nature of which such disease was due. Such apportionment is to be proportioned to the time such employee was employed in the service of such employers provided, that if a prior employer has met the requirements as to minimum standards herein provided for and has been certified by the industrial commission to that effect, that then the commission shall take into consideration in the apportionment of such liability not only the period of service of said employee with such employer, but shall likewise consider the element of exposure to which the employee was subjected while in the service of such employer maintaining minimum standards, and the apportionment determined only after a hearing, notice of the time and place of which is to be given to each employer alleged to be liable for any portion of such compensation. If the commission find that any portion of such compensation is payable by an employer prior to the employer who is made liable to the total compensation, * * * it shall make an award accordingly in favor of the last employer, which may be enforced in the same manner as an award for compensation."

Minn. St. 176.66, subd. 6, provides: "The employer to whom notice of death or disability is to be given or against whom claim is to be made by the employee or his dependents is the employer who last employed the employee during the 12 months in the employment to the nature of which the disease was due and in which it was contracted * * *."

N. W. 265; Wandersee v. Brellenthin Chevrolet Co. 258 Minn. 19, 102 N. W. (2d) 514; see, also, Dockendorf v. Lakie, 251 Minn. 143, 86 N. W. (2d) 728; Lang v. William Bros Boiler & Mfg. Co. 250 Minn. 521, 85 N. W. (2d) 412. In Orth v. Shiely Petter Crushed Stone Co. 253 Minn. 142, 91 N. W. (2d) 463, for reasons therein expressed, we refused to extend subrogation rights to an employer or its insurer as against an employee seeking benefits from the *custodian of the special compensation fund* under § 176.13, but therein at no time did we divert from the established rule that an employer's right of subrogation under the act extended to the compensation insurer of such employer. See, Wandersee v. Brellenthin Chevrolet Co. *supra.*

Accordingly, it would follow that, under § 176.66, subd. 5, the insurer-relator, notwithstanding the commission's denial of its previous motion to bring in the prior insurers, may now institute proceedings against them for apportionment of its loss herein. If upon the hearing provided therefor under § 176.66, subd. 5, the commission shall find upon the evidence submitted that decedent contracted the fatal disease at a time prior to that during which the insurer-relator carried the employer's compensation risks, it may then order apportionment of such loss as provided for under this statute. Since respondent is not a necessary party to such proceedings, they should not further forestall her from receiving payment of the compensation awards heretofore made to her by the commission.

Respondent is allowed the sum of $250 for attorney's fees in addition to her costs and disbursements.

Affirmed.