Moyer, Appellant, v. Morysville Body Works, Inc.

Argued March 21, 1969. Before WRIGHT, P. J., WATKINS, MONTGOMERY, JACOBS, HOFFMAN, SPAULDING, and CERCONE, JJ.

*Forrest G. Schaeffer, Jr.,* with him *Edelman, Schaeffer, Saylor & Readinger,* for appellant.

*John F. Ledwith,* with him *Joseph R. Thompson,* for appellee.

OPINION PER CURIAM, September 11, 1969:
Order affirmed.

———

DISSENTING OPINION BY HOFFMAN, J.:
This is an appeal from a denial of benefits under The Pennsylvania Occupational Disease Act, P. L. 566, No. 284, §101 et seq., 77 P.S. §1201 et seq.

The facts are set out fully and succinctly in the opinion of Commissioner Geer of the Workmen's Compensation Board:

"The claimant was first employed by the defendant, Morysville Body Works, Inc. on April 1, 1957 as a spray painter in the truck body painting division. He worked there continuously until December 13, 1962 when he was forced to leave his employment because of total disability from aplastic anemia which is a disease resulting from the destruction of the blood-producing bone marrow and which is, in most cases, fatal. On becoming too ill to continue work, the claimant was admitted to the Pottstown Hospital from December 14, 1962 until January 3, 1963 and was also admitted to the Temple University Hospital from January 3, 1963 until January 10, 1963. Following that

he was in and out of the hospital at various times until July 1963.

"As a part of the claimant's case, there were admitted into evidence several exhibits which were the quantitative and qualitative analyses of the various paints used by the claimant during the five years in which he was employed in the defendant's spray paint shop. It should be noted that, in most instances, more than half of the total volatile matter of which the paints were composed were of aromatic hydrocarbons (notably zylene and toluene).

"Dr. Ross M. Bushyager, a general practitioner, testified that he attended the claimant from December 13, 1962. He treated the claimant by the administration of transfusions with fresh whole blood high in platelet contents and referred the claimant to his various hospitalizations. He diagnosed the claimant's condition as aplastic anemia which he stated was due to exposure to toxic hydrocarbons in the form of either paint or solvents (N.T. 32, 10/9/63).

"Dr. William B. Barry a specialist in internal medicine and hematology testified that he first examined the claimant in January 1963 and following multiple tests on the claimant, including an examination of the marrow of his bones, concluded that the claimant had hypoplastic marrow, consistent with toxic depression. He confirmed Dr. Bushyager's diagnosis of aplastic anemia. Dr. Barry stated that it was his opinion with reasonable medical certainty that the claimant's condition of aplastic anemia was caused by his exposure to a combination of materials indicated on the list of ingredients to which the claimant states he was exposed (N.T. 41, 10/9/63). On cross-examination Dr. Barry singled out the chemicals which he felt were responsible for the claimant's condition as follows (N.T. 46, 10/9/63). 'Q. Would you tell us which chemicals mentioned on all those lists you feel caused the condition

in this case? A. Xylol, Toluol . . . and there are several chemicals here of a benzine type of chemical such as naphtha, butyl benzyl phthalate which has a benzyl ring.' Dr. Barry characterized the claimant as totally disabled and stated that the claimant has about a 50% chance of surviving from two to two and a half years (N.T. 54, 10/9/63).

"Dr. Heinrich Breiger, a toxicologist, testifying for the defendant, reviewed the testimony of Dr. Barry and replied to a hypothetical question that in his opinion the chemical substances listed in the claimant's exhibits could not cause aplastic anemia. Dr. Breiger did admit that both xylene and Toluene had been suspected of causing aplastic anemia but that in his opinion they were not the precipitating cause of the claimant's condition.

"The claimant then produced Dr. Arthur J. Weiss, an Assistant Professor of medicine at Jefferson Medical College with special training in hematology. In reply to a hypothetical question, Dr. Weiss testified that claimant's exposure to the various paints and solvents almost certainly was the cause of his aplastic anemia and stated that although benzine is by far the commonest cause of aplastic anemia, there have been cases of the disease reported after exposure to both toluene and zylene."

Claimant applied for benefits under §108(n) of The Pennsylvania Occupational Disease Act, 77 P.S. §1208 (n) which states that compensable occupational diseases shall include "All other occupational diseases (1) to which the claimant is exposed by reason of his employment, and (2) which are peculiar to the industry or occupation and (3) which are not common to the general population."[1]

---

[1] It would appear that claimant might also have made claim under §108(d), 77 P.S. §1208(d), which provides coverage for

The Board, as noted above, agreed that claimant was totally disabled. It denied the claim, however, on the ground that aplastic anemia was not peculiar to the industry or occupation and was common to the general population. In making this finding, it relied principally on the following testimony of Doctor Weiss, one of claimant's physician experts who testified as follows: "Q. This disease of aplastic anemia has been known to occur in children, has it not? A. Yes. Q. And older adults? A. Yes. Q. Middle age? A. Yes. Q. And even in young adults? A. Yes. Q. Had it ever occurred in the case of a housewife? A. Yes, but it is much, much rarer. Q. I appreciate that, but it occurs then in females as well as males? A. With the relative incidence of ten to one in favor of males. Q. It occurs in all ethnic groups and races? A. Yes. Q. And this occurs in many walks of life? A. That is true. Q. So it is not peculiar to any one industry, anyone can get it? A. Yes. Q. It is a disease that can occur spontaneously or without any traceable cause, is that true that this can happen? A. Yes. Q. And a person can get it without having it related to any occupation, you can get it without any known cause? A. Yes."

The lower court affirmed the dismissal of the claim. This appeal followed.

The Board's decision was based primarily on the decisions of our court in *Scott v. United States Steel Corporation,* 203 Pa. Superior Ct. 459, 201 A. 2d 243 (1964) and *Porter v. Sterling Supply Corp.,* 203 Pa. Superior Ct. 138, 199 A. 2d 525 (1964). It becomes necessary, therefore to review these cases before considering the applicability of the statute to this case.

---

"Poisoning by benzol, or by nitro amido or amino derivatives of benzol. . . . or their preparations or compounds, in any occupation involving direct contact with handling thereof, or exposure thereto," in light of the testimony of the doctors that certain of the chemicals were benzol derivatives.

In *Scott*, the claimant contracted lung cancer after having been exposed as a laborer to coal tar by-products. This Court held that the claimant "must first find from the evidence that the disease was a hazard of the industry and that the claimant was exposed to it; and, from the evidence, that it was peculiar to this industry and not common to the general public; and it is only after such findings that the presumption set forth in §301(f) [that the occupational disease arose out of the course of the employment] comes into being."

In *Scott*, the Court stated further, "We must take judicial notice of the fact that lung cancer is not peculiar to this industry and that it is common to the general public. We might just as well say that this claimant was exposed, in this industry, as he might very well be, to the common cold, and that it is peculiar to the industry and not common to the general public."

Our Court's conclusion in the *Scott* case, therefore was that, "Even if there had been unequivocal medical testimony that this man died of lung cancer caused by his employment in the mill; and even if the compensation authorities believed this medical testimony and found it as a fact and so awarded benefits . . . we would then have to reverse as a matter of law because the claimant had failed . . . to establish lung cancer as an 'occupational disease.' "

The holding in *Porter*, supra, involving pulmonary emphysema was similar. That disease, even if caused by claimant's occupation was not compensable because it was not peculiar to the industry or occupation and it was common to the general public.

The interpretation given *Scott* and *Porter* by the Board, therefore, has been that there must appear some statistical analysis of the industry as a whole showing

that the disease is peculiar to it. Moreover, the disease must not appear among the population in general.

The difficulty with *Scott, Porter* and other cases under the Occupational Disease Act is that they have never truly analyzed what factors must be found in deciding whether a disease is "peculiar to the industry or occupation, and not common to the general population."[2] The Board has exhibited a tendency to accept or reject testimony in this regard and without discussion to determine whether a particular disability arises from an occupational disease. This Court, in turn, feeling itself bound by the Board's findings and without the benefit of the Board's underlying analysis, generally affirms their conclusions of law in this regard. Yet, we have never set forth guidelines for ourselves, or for the Board, which would establish the criteria for making such a determination.

The lack of clarity in these cases may best be understood by reference to *Porter*. In *Porter*, we affirmed the finding of the Board that pulmonary emphysema was not an occupational disease because it was common to the general public. Yet, one year later, in *Habovick v. Curtis Wright*, 207 Pa. Superior Ct. 80, 215 A. 2d 389 (1965), we did not hesitate to find that pulmonary fibrosis, another common disease, could qualify as an occupational disease. Our determination in these cases, however, actually only represented tacit acceptance of the Board's findings inconsistent though they were.

In my opinion the determination of whether a disease is peculiar to the occupation must be made by

---

[2] It should be noted that even with respect to diseases specifically enumerated the claimant must show that they are "peculiar to the occupation or industry in which the employe was engaged and not common to the general population." This standard, of course, did not originate with §1208(n) but was already found with respect to all occupational diseases in §301 of the Act.

reference to the actual exposure and hazard of the employment.

Deciding whether the statutory requirement that an occupational disease be peculiar to a particular occupation and not common to the general public is a question that has been considered in other jurisdictions. The language in the Occupational Disease Acts of many States very closely follows that contained in ours. In the vast majority of cases which have considered the concept, courts have held that if the risk of contracting a certain disease is greater in a particular industry than in ordinary employment and under ordinary conditions of life, that disease is compensable if causation is shown. See *Mills v. Detroit Tuberculosis Sanitarium,* 323 Mich. 200, 35 N.W. 2d 239 (1948); *Aleutian Homes v. Fischer,* 418 P. 2d 769 (1966); *Concaincon v. Oregon Portland Cement Company,* 447 P. 2d 290 (1968); *Glodenis v. American Brass Co.,* 170 A. 146 (Conn. 1934); *Underwood v. National Motor Castings Division,* 329 Mich. 273, 45 N.W. 2d 286 (1951); *Gray v. City of St. Paul,* 84 N.W. 2d 606 (Sup. Ct. Minn. (1957); *Ritter v. Hawkeye Security Ins. Co.,* 178 Neb. 792, 135 N.W. 2d 470 (1965).

Simply because a disease occurs outside of a particular industry should not automatically disqualify it as an occupational disease. Indeed, many of the diseases specifically enumerated under §108 of the Act do appear in great numbers among members of the general public. Yet they are compensable. Thus, lead poisoning, X-ray overexposure and tuberculosis are specifically enumerated as occupational diseases under the Act. Indeed, even "infection or inflammation of the skin due to oils, cutting compounds, lubricants, dusts, liquids, gases or vapor. . ." may be an occupational disease.

Thus, the statutory requirement that a claimant must suffer from a disease "not common to the general

public" is best understood as not excluding compensation for those diseases which appear among the general public but which bear a greater risk in the particular industry in which the claimant is employed.

This was the approach taken by the late Judge ALESSANDRONI in *Woolf v. Bardinet Exports, Inc.*, 77 Pa. D. & C. 230 (1951). There the claimant and another employee were the only persons in a plant who worked with a particular glue, and both contracted a skin disease. The court stated: "We cannot agree with defendant's contention that this is a disease common to the general population, merely because their medical expert stated that he treated housewives for the same condition resulting from too much immersion of the hands in dish water, and the impartial expert arriving at the same diagnosis stated that sufficient exposure to dish water might produce this condition. It is clear in this case that claimant's condition did not arise from any source other than her work, and though other people may contract comparable skin diseases from other nonoccupational sources, section 108 (i) would be reduced almost to the meaningless if defendant's theory were adopted." See to the same effect *Ritter v. Hawkeye Security Insurance Co.*, supra, and *Buggs v. Hope's Windows, Inc.*, 284 App. Div. 1077, 136 N.Y.S. 2d 41 (1954).

Proof of the increased risk of contracting the disease in particular occupations may be presented in various ways. Where statistical evidence can establish the increased hazard in the person's occupation, such evidence should be considered. Where, however, such statisical evidence has never been assembled, or is unavailable because the disease is rare or is dependent upon other factors, such as the sensitivity of the individual, expert testimony as to the hazardous nature of the employment should be accepted. Any other approach would seriously discriminate against the em-

ployee in an occupation where no studies have been made or where the disease is very rare.

An example of such analysis is found in *Metz v. Quakertown Stove Works,* 156 Pa. Superior Ct. 70, 39 A. 2d 534 (1944), dealing with §§301(c) and (f) of the Occupational Disease Act. Under §301(f) of the Act, "If it be shown that the employe, at or immediately before the date of disability, was employed in any occupation or industry in which the occupational disease is a hazard, it shall be presumed that the employe's occupational disease arose out of and in the course of his employment but this presumption shall not be conclusive." In *Metz,* the claimant contracted silicosis from polishing metal stove parts with a solid carborundum wheel. The doctor who testified on behalf of the claimant was an expert in pulmonary diseases, including silicosis. He testified that "in his professional opinion a polisher of cast iron stove parts is employed in an occupation in which silicosis is a hazard." We stated, "We think that Dr. Hetherington's testimony was sufficient to bring the case within the provision of clause (f) of §301." In short, we accepted the analysis of a physician, that silicosis was a hazard of this occupation by reliance on the physician's analysis of the actual work done even though the physician was without statistical evidence in this regard.

The holding of our court in *Metz,* was recognized by the Supreme Court most recently in *Hale v. Metalweld, Inc.,* 434 Pa. 109, 252 A. 2d 663 (1969) and *Crews v. Carey,* 207 Pa. Superior Ct. 461, 218 A. 2d 103 (1966), where the appellate courts of our Commonwealth have indicated that there are instances where we may take judicial notice of the fact that there is a silica hazard in certain industries.

With this analysis in mind we turn to the disease in the instant case. Aplastic anemia, as all of the doc-

tors testified is a rare disease, one which is not commonly found among the general population. Contraction of the disease will often depend on a person's hypersensitivity and reaction to an irritant. Thus, when Dr. Barry was asked "would an industrial environment like Dale L. Moyer was exposed to generally or usually produce aplastic anemia," he answered, "A. No, because of the fact it depends a great deal on the hypersensitivity of the individuals exposed. If you take 100 people and expose them to the same environment, perhaps no one would develop aplastic anemia, perhaps one would, this is a very slim number. As such persons with sensitivity the irritants involved would be more likely to contract the disease than members of the general public."[3]

The testimony of all of claimant's physicians, however, indicated that one working in an area where the toxic material in this case are present in the air, undergoes a greater risk of contracting aplastic anemia.

A most literate statement in this regard was given by Dr. Weiss who stated, "It is also my opinion that the exposure in any individual to almost any type of the compounds described in this industry can, if a person has an idiosyncracy or has a tendency to do so, develop an aplastic anemia. It is obviously impossible in any one case to prove that any one thing is responsible for this man's illness but from our knowledge of aplastic anemia, our knowledge of this hypothetical individual's history of well being and his exposure to many agents of the type that can cause aplastic anemia, I would say that the overwhelming probability, and

---

[3] A majority of the courts in this country have held that the fact that an individual's contraction of a disease depends, in part, on his hypersensitivity does not preclude his receiving compensation benefits. See 1 A Larson, Workmen's Compensation Law, §41.62 (1967), and cases cited therein.

this is all that medicine is really based upon, is that one or more of the materials that the man was exposed to between 1957 and 1962 is responsible for his blood dyscrasia and I do not think it is going to be even possible, in any case like this to prove what agent is responsible."

Dr. Weiss's statement is relevant because it demonstrates with great clarity that medicine can never assign a cause for a disease with absolute certainty. It can only suggest probabilities in this regard. While it is true that other persons not involved in this occupation may contract aplastic anemia, this alone should not bar recovery where both the greater possibility of contracting the disease in this occupation and the probability that this disease did result from his employment are established by reliable testimony. The statement of the Superior Court of New Jersey in this regard is significant: "The standard is probability, not certainty; conclusive proof can seldom be offered, and is not required. The petitioner's proofs may be direct, circumstantial or presumptive. *Reynolds v. General Motors Corp.*, 40 N.J. Super. 484, 123 A. 2d 555 (1956).

In summary, then, claimant's physicians testified that he was exposed to industrial environment hazards leading to his contraction of aplastic anemia. They further testified that while the disease is rare, it does occur among persons of all ages and in various walks of life. Nonetheless, they all agreed that one employed as a spray painter would be more likely to contract the disease by reason of his employment, and, as such, it was a hazard of his occupation in general. In my opinion, this testimony, if believed, would satisfy the requirement that the disease is peculiar to the occupation and is not common to the general population.

Therefore, this case should be remanded to the Board for reconsideration. The Board should first de-

termine whether aplastic anemia constitutes an occupational disease in the circumstances of the instant case in light of the considerations set forth in this opinion. Should the Board find that it does qualify as an occupational disease, and is a hazard of the occupation in question, the presumption should arise, under §301(f) of the Act that the disease arose out of claimant's employment, subject to proof to the contrary by the employer.

SPAULDING, J., joins in this dissenting opinion.