9 P.3d 382

Kathleen M. FLOR, Claimant–Appellant,

v.

Carlos Richard HOLGUIN, D.D.S., and Pacific Insurance Company, Employer/Insurance Carrier–Appellee,

and

Douglas H. Dierenfield, D.D.S., and Travelers Insurance Company, Employer/Insurance Carrier–Appellee,

and

William R. Babbitt, D.D.S., and Pacific Insurance Company, Employer/Insurance Carrier–Appellee,

and

Carlos Ricard Holguin, D.D.S., and Island Insurance Company, Employer/Insurance Carrier–Appellee,

and

William R. Babbitt, D.D.S., and Crawford and Company, Employer/Insurance Carrier–Appellee

No. 22641.

Supreme Court of Hawai'i.

May 30, 2000.

Reconsideration Denied Aug. 30, 2000.

John P. Powell, Kailua Kona, on the briefs, for the claimant-appellant Kathleen M. Flor.

Scott R. Devenney, Honolulu, on the briefs, for employer/insurance carrier-appellee Carlos R. Holguin and Pacific Insurance Co., Ltd.

Roland Q.F. Thom and Rock B. Ley (of Char Hamilton Campbell & Thom), Honolulu, on the briefs, for employer/insurance carrier-appellee William R. Babbitt and Pacific Insurance Co., Ltd.

MOON, C.J., LEVINSON, NAKAYAMA, RAMIL, JJ., and Circuit Court Judge BAXA, Assigned by Reason of Vacancy.

Opinion of the Court by LEVINSON, J.

The claimant-appellant Kathleen M. Flor appeals from the decision and order of the State of Hawai‘i Labor and Industrial Relations Appeals Board (LIRAB), filed on May 25, 1999, and the amended decision and order of the LIRAB, filed on May 28, 1999, affirming the director of labor and industrial relations' ("the Director") denial of compensability of Flor's workers' compensation claims and granting summary judgment in favor of the following employer/insurance-carrier appellees (collectively, "the Employers"): Carlos Richard Holguin, D.D.S., and Pacific Insurance Company [hereinafter, Holguin/Pacific]; Douglas H. Dierenfield, D.D.S., and Travelers Insurance Company [hereinafter, Dierenfield/Travelers]; William R. Babbitt, D.D.S., and Pacific Insurance Company [hereinafter, Babbitt/Pacific]; Carlos Richard Holguin, D.D.S., and Island Insurance Company [hereinafter, Holguin/Island]; and William R. Babbitt, D.D.S., and Crawford And Company [hereinafter, Babbitt/Crawford]. On appeal, Flor raises a single point of error, namely, that the LIRAB erred in denying her workers' compensation claims against the Employers under Hawai‘i Revised Statutes (HRS) ch. 386 [hereinafter, the Workers' Compensation Law] inasmuch as Flor was unable to determine the date on

which she acquired the hepatitis C virus. For the reasons explained in this opinion, we agree. We therefore vacate the LIRAB's orders and remand to the Director for further proceedings consistent with this opinion, including (1) the determination whether and during what periods, if any, Flor was temporarily and/or permanently and partially and/or totally disabled as a result of her hepatitis C and (2) the apportionment of liability with respect to Flor's workers' compensation claim among Holguin/Pacific, Dierenfield/Travelers, and Babbitt/Pacific.

## I. BACKGROUND

### A. Factual History

Flor has worked as a dental hygienist since the 1960s. She has been employed by numerous dentists and periodontists over the course of her career. Flor was employed part time by Babbitt from 1987 to 1996, by Dierenfield from 1989 to 1994, and by Holguin from 1991 to 1996.

As a dental hygienist, Flor used sharp instruments to clean her patients' teeth. Her patients bled during the cleaning procedure. Flor sustained numerous "cuts and pokes" by her instruments over the course of her career, including wounds sustained during her employment with Babbitt, Dierenfield, and Holguin.

Flor was first treated for symptoms consistent with hepatitis in 1990. However, the hepatitis C test ordered for Flor in December 1990 reflected a negative result. Three years later, she was again tested for hepatitis C. On January 12, 1994, the positive results of that test were obtained by the physician who ordered it, although Flor did not learn of her hepatitis C diagnosis until April 17, 1996, after another physician arranged for further tests to be performed. Because of health problems caused by the hepatitis C, Flor ceased working on May 4, 1996.

The hepatitis C virus was first identified in 1989, and the first test for the disease was introduced in 1990. The medical evidence adduced by the parties suggested that symp-toms of or abnormalities resulting from hepatitis C may manifest themselves within two to ten weeks after exposure. However, many patients remain asymptomatic, and the rate of progression of the disease is believed to be highly variable, the average time between infection and advanced liver disease being between ten and twenty years. Numerous physicians opined, by way of letters obtained by the parties and made part of the record in the present matter, that Flor's employment as a dental hygienist was a risk factor, which, in the absence of other risk factors, indicated that Flor probably had acquired hepatitis C through work exposure to contaminated blood. However, some of the physicians noted risk factors for hepatitis C infection other than work exposure to contaminated blood. The physicians' opinions regarding the timing of Flor's first exposure to the virus were based upon their view of the stage to which her liver disease had progressed, which suggested that she had probably first acquired the virus in the 1980s or earlier. There was, however, no test or procedure that could reliably isolate either the time of first infection with hepatitis C or the source of the infection.

Flor was unable to recall, identify, or otherwise determine the date on which she contracted hepatitis C. She does not contest that she probably contracted the disease prior to 1990. Responding to the Employers' requests for admissions, Flor admitted that she possessed no direct or conclusive evidence that she had been exposed to or infected by hepatitis C while in the employ of Babbitt, Dierenfield, or Holguin.

### B. Procedural History

On October 7, 1996, Flor filed separate claims for workers' compensation benefits against Holguin/Island, Babbitt/ Crawford, and Dierenfield/Travelers,[1] allegedly arising out of a work-related injury "occurring" on April 17, 1996. Flor identified her "injury" as hepatitis C.

1. Flor subsequently withdrew her claim relating to the "April 17, 1996" work injury against Dier- enfield/Travelers.

On March 31, 1997, Flor filed separate claims for workers' compensation benefits against Holguin/Pacific, Dierenfield/Travelers, and Babbitt/Pacific, allegedly arising out of a work-related injury "occurring" on January 12, 1994. Again, she identified her "injury" as hepatitis C.

On December 2, 1997, the Disability Compensation Division of the Department of Labor and Industrial Relations (DLIR) heard Flor's five consolidated claims. On February 5, 1998, the Director rendered a decision denying Flor's claims on the basis that she "did not suffer any injury on January 12, 1994 or April 17, 1996, the dates listed as the date of injury on her claims." Flor filed a timely notice of appeal to the LIRAB on February 17, 1998.

On March 23, 1999, Holguin/Pacific filed a motion for summary judgment, alleging that they were entitled to judgment because, *inter alia*, Flor had admitted that she had not sustained a work-related injury on January 12, 1994. On March 29, 1999, Babbitt/Crawford filed a separate motion for summary judgment on the grounds that there was no evidence in the record that Flor had been exposed to the Hepatitis C virus while employed by Babbitt and that she had contracted the disease before Crawford's insurance coverage of Babbitt had commenced. The remaining Employers joined in Holguin/Pacific's motion.

On April 6, 1999, Flor filed a memorandum in opposition to Holguin/Pacific's motion for summary judgment, asserting both that genuine issues of material fact precluded the entry of summary judgment against her and that, based upon facts that *were* uncontroverted,[2] she was entitled to a finding that her claim was compensable.

The LIRAB conducted a hearing on the Employers' motions on April 7, 1999. In a decision and order filed on May 25, 1999, the LIRAB stated:

At the outset of the hearing, all of the parties stipulated that there were no genuine issues of material fact as to the issue of whether [Flor's] Hepatitis C condition arose out of and in the course of her employment with Drs. Holguin, Babbitt, and/or Dierenfield on January 12, 1994 or on April 17, 1996. All of the parties agreed that the issue of compensability was ripe for summary disposition by the [LIRAB]. The parties further stipulated that issues relating to statute of limitations and notice of claim would not be addressed by the [LIRAB] in ruling on the motions for summary judgment.

There being no genuine issue of material fact, we grant the motions for summary judgment in favor of [the Employers] and affirm the Director's denial of compensability of [Flor]'s claims for injury on January 12, 1994 and/or April 17, 1996.

However, the transcript of the hearing does not reflect that any express stipulations were entered on the record, and the record is devoid of any further information regarding the purported stipulations.

The LIRAB entered the following relevant findings of fact (FOFs):

13. [Flor] did not contract Hepatitis C on January 12, 1994, or on April 17, 1996.

14. . . . There is no evidence and [Flor] does not allege that her employment with Holguin/Pacific, or Holguin/Island, or Babbitt/Crawford exposed her to Hepatitis C on January 12, 1994, or on April 17, 1996.

15. . . . There is no evidence and [Flor] does not allege that her employment with Dierenfield/Travelers or Babbitt/Pacific exposed her to Hepatitis C on January 12, 1994.

2. The "undisputed" facts that Flor cited to the LIRAB and this court were the following:
 1. Flor has hepatitis C.
 2. Flor cannot identify the date [on which] she contracted the illness, and it is not possible at this date to discover the date and manner of transmission.
 3. Her profession and instrument sticks she suffered at work present identifiable risk of infection.

 4. The first symptoms began in 1990.
 5. No tests were available to identify hepatitis C before 1990, and no reliable tests existed before 1992.
 6. The usual course of hepatitis C is asymptomatic for the first 10–20 years, except for an initial acute phase.
 7. Given Flor's current condition, it is probable that she contracted the disease prior to 1990.

16. [Flor] did not sustain or suffer any injury on January 12, 1994, or on April 17, 1996.

The LIRAB entered a single conclusion of law (COL), as follows:

[W]e conclude that [Flor] did not sustain a personal injury on or about January 12, 1994, arising out of and in the course of her employment with Dr. Dierenfield or Dr. Babbitt. We further conclude that [Flor] did not sustain a personal injury on or about April 17, 1996, arising out of and in the course of her employment with Dr. Holguin or Dr. Babbitt. [Flor's] claims against Holguin/Pacific, Holguin/Island, Babbitt/Crawford, and Babbitt/Pacific, and Dierenfield/Travelers were properly denied.

On May 28, 1999, the LIRAB amended its COL to state that "[Flor] did not sustain a personal injury on or about January 12, 1994, arising out of and in the course of her employment with Dr. Dierenfield, Dr. Babbitt, *or Dr. Holguin.*" (Emphasis in original.)

Flor filed a timely notice of appeal to this court on June 25, 1999.

## II. *STANDARDS OF REVIEW*

### A. *Agency Decisions*

■ Appellate review of the LIRAB's decision is governed by Hawai'i Revised Statutes (HRS) § 91–14(g) (1993), which provides:

Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

HRS § 91–14(g). "Under HRS § 91–14(g), [COLs] are reviewable under subsections (1), (2), and (4); questions regarding procedural defects are reviewable under subsection (3)[.]" *Potter v. Hawai'i Newspaper Agency,* 89 Hawai'i 411, 422, 974 P.2d 51, 62 (1999) (quoting *Korean Buddhist Dae Won Sa Temple v. Sullivan,* 87 Hawai'i 217, 229, 953 P.2d 1315, 1327 (1998) (quoting *Konno v. County of Hawai'i,* 85 Hawai'i 61, 77, 937 P.2d 397, 413 (1997) (quoting *Bragg v. State Farm Mutual Auto. Ins.,* 81 Hawai'i 302, 305, 916 P.2d 1203, 1206 (1996)))).

A[COL] ... is not binding on an appellate court and is freely reviewable for its correctness. Thus, the court reviews [COLs] *de novo,* under the right/wrong standard.

*Bumanglag v. Oahu Sugar Co., Ltd.,* 78 Hawai'i 275, 279, 892 P.2d 468, 472 (1995) (quoting *Tate v. GTE Hawaiian Tel. Co.,* 77 Hawai'i 100, 102–03, 881 P.2d 1246, 1248–49 (1994) (brackets in original)).

*Kahana Sunset Owners Ass'n v. County of Maui,* 86 Hawai'i 66, 68–69, 947 P.2d 378, 380–81 (1997) (some brackets added and some in original).

### B. *Statutory Interpretation*

■ "[T]he interpretation of a statute ... is a question of law reviewable *de novo.*" *State v. Arceo,* 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996) (quoting *State v. Camara,* 81 Hawai'i 324, 329, 916 P.2d 1225, 1230 (1996) (citations omitted)). *See also State v. Toyomura,* 80 Hawai'i 8, 18, 904 P.2d 893, 903 (1995); *State v. Higa,* 79 Hawai'i 1, 3, 897 P.2d 928, 930, *reconsideration denied,* 79 Hawai'i 341, 902 P.2d 976 (1995); *State v. Nakata,* 76 Hawai'i 360, 365, 878 P.2d 699, 704, *reconsideration denied,* 76 Hawai'i 453, 879 P.2d 558 (1994), *cert. denied,* 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995). *Gray v. Administrative Director of the Court,* 84 Hawai'i 138, 144, 931 P.2d 580, 586 (1997) (some brackets added and some

in original). *See also State v. Soto,* 84 Hawai'i 229, 236, 933 P.2d 66, 73 (1997). Furthermore, our statutory construction is guided by established rules:

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

. . . .

*Gray,* 84 Hawai'i at 148, 931 P.2d at 590 (quoting *State v. Toyomura,* 80 Hawai'i 8, 18–19, 904 P.2d 893, 903–04 (1995)) . . . (footnote omitted). This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it . . . to discover its true meaning." HRS § 1–15(2) (1993).

*State v. Kotis,* 91 Hawai'i 319, 327, 984 P.2d 78, 86 (1999) (citations omitted) (some ellipsis points added and some in original).

## III. *DISCUSSION*

### A. *Compensability Of Injuries Caused By Occupational Disease Under The Workers' Compensation Law*

The term "occupational disease" does not appear in the Workers' Compensation Law.

Although our statute does not specifically have any provision regarding occupational disease, as do the workmen's compensation acts of many States, an examination of these decisions is interesting and instructive because, in substance, we have the same law where the disease is "proximately caused by the employment." (R. L.H.1955, § 97–3.[3])

"It is common knowledge that pulmonary tuberculosis is a disease to which the general public is exposed and it is not peculiarly an occupational disease in the sense that the courts have come to regard silicosis or painter's lead poisoning, as examples. It may become an occupational disease, however, if it appears to have had its origin in a risk connected with the employment and to have flowed from that source as a consequence. It seems obvious that if one is employed in a sanatorium for the treatment of tuberculosis, contraction of the disease is a hazard to which the workman would not have been equally exposed outside the employment and therefore the disease is incidental to the business and not independent of the relation of the employer and employee." (*Evans v. Indiana Univ. Medical Center,* 100 N.E.2d 828, 121 Ind.App. [679] 678 [1951].)

The court stated that if the industrial board had found that the claimant contracted tuberculosis during the course of employment, there was ample evidence to sustain such finding.

There are numerous other cases similarly holding tuberculosis is an occupational disease where it can be shown that the employee is more exposed than the general public. (*Gray v. City of St. Paul,* 250 Minn. 220, 84 N.W.2d 606; *Board of National Missions v. Alaska Industrial Board,* 116 F.Supp. 625, and cases cited therein.)

*Fukuoka v. Dodo,* 43 Haw. 337, 343, 1959 WL 11663 (1959) (brackets in original). The foregoing observations, made in the context of the workers' compensation claim of a mortuary employee who had contracted tuberculosis, apply equally to Flor's hepatitis C claim under the contemporary counterpart of R.L.H. § 97–3 (1955), *i.e.,* HRS § 386–3 (1993 & Supp.1999).[4] The case law of other

---

3. R.L.H. § 97–3 (1955) provided in relevant part:

 If a workman receives personal injury by accident arising out of and in the course of the employment or by disease proximately caused by the employment, or resulting from the nature of the employment, his employer or the insurance carrier shall pay compensation in the amounts and to the person or persons hereinafter specified.

4. HRS § 386–3 (1993) provided in relevant part:

 If an employee suffers personal injury either by accident arising out of and in the course of the employment or by *disease proximately caused by or resulting from the nature of the employment,* the employee's employer or the special compensation fund shall pay compensation to the employee or the employee's dependents as hereinafter provided.

jurisdictions recognizing hepatitis C as an occupational disease includes *Muir v. C.R. Bard Inc.*, 336 S.C. 266, 519 S.E.2d 583 (Ct. App.1999) (hepatitis C was occupational disease for worker who examined failed catheters, some of which were bloody); *Bloomington Hospital v. Stofko*, 705 N.E.2d 515 (Ind. Ct.App.1999) (hepatitis C was occupational disease for hospital employee); *Price v. City of New Orleans*, 672 So.2d 1045 (La.Ct.App. 1996) (hepatitis C contracted by fire fighter was occupational disease); *Jeannette District Memorial Hospital v. Workmen's Compensation Appeal Board*, 668 A.2d 249 (Pa. Cmwlth.Ct.1995) (statute provided that "serum hepatitis" was occupational disease, thereby raising presumption that registered nurse infected with hepatitis C suffered work-related disability); *Fairfax County v. Espinola*, 11 Va.App. 126, 396 S.E.2d 856 (1990) (non-A and non-B hepatitis, *i.e.* hepatitis C, was occupational disease for police department technician exposed to blood products through blood and breathalyzer tests); *but see Wheaton v. City of Tulsa Fire Department*, 970 P.2d 194 (Okla.Ct.App.1998) (hepatitis C contracted by fire fighter was not occupational disease under Oklahoma workers' compensation law, but could be compensable accidental injury based on repeated exposures to disease while moving injured individuals, even though claimant could not determine the precise exposure that caused him to contract disease). Hepatitis has been expressly recognized as an occupational disease for dental hygienists. *Sirkin and Levine v. Timmons*, 652 A.2d 1079 (Del.Super.Ct.1994); *Hansen v. Gordon*, 221 Conn. 29, 602 A.2d 560 (1992).[5]

■ An accidental injury is distinguished from an occupational disease in that the former generally results from a discrete event—the time and place of which can be fixed—, while the latter generally develops gradually over a long period of time. *Booker v. Duke Medical Center*, 297 N.C. 458, 256

S.E.2d 189, 197 (1979). When a disease causing injury results from an identifiable accident, rather than from a peculiar risk of the employment, it should be compensated as an accidental injury. *Baldwin v. Jensen–Salsbery Laboratories*, 10 Kan.App.2d 673, 708 P.2d 556, 557–58 (1985) (maintenance worker in plant contaminated by brucella cultures—who cut hand on sheet of metal retrieved from floor tool that had fallen into liquid containing brucella and who became ill with brucellosis two weeks later—held to have contracted brucellosis by accident) (citing *Wilson Foods Corp. v. Porter*, 612 P.2d 261 (Okla.1980)). *See also Booker*, 256 S.E.2d 189, 198 (holding that "[i]f an employee contracts an infectious disease as a result of his employment and it falls within either the schedule of diseases set out in the statute or the general definition of 'occupational disease' . . ., it should be treated as a compensable event regardless of the fact that it might also qualify as an 'injury by accident,'" and ruling that hepatitis contracted by laboratory technician was compensable occupational disease).

■ As noted *supra* at note 4, HRS § 386–3 provides in relevant part that "[i]f an employee suffers personal injury . . . by disease proximately caused by or resulting from the nature of the employment, the employee's employer or the special compensation fund shall pay compensation to the employee[.]"

We have traditionally construed HRS § 386–3 liberally in favor of conferring compensation because our "'legislature has decided that work injuries are among the costs of production which industry is required to bear[.]'" *Chung v. Animal Clinic, Inc.*, 63 Haw. 642, 649, 636 P.2d 721, 726 (1981) (quoting *Akamine v. Hawaiian Packing & Crating Co.*, 53 Haw. 406, 409, 495 P.2d 1164, 1166 (1972)); *Royal State Nat'l Ins. Co. v. Labor and Indus.*

(Emphasis added.) In 1998, the statute was amended in respects not material to the present appeal. Inasmuch as Flor suffered her disability in 1996, the pre-amendment version of the statute is controlling. *See infra* section III.B.

HRS § 386–1 (1993 & Supp.1999) defines "'[e]mployment' [to] mean[] any service performed by an individual for another person

under any contract of hire or apprenticeship, express or implied, oral or written, whether lawfully or unlawfully entered into."

**5.** The claimants in *Timmons* and *Hansen* suffered from hepatitis B, but the analysis set forth in those cases applies equally to hepatitis C.

*Relations Appeal Bd.*, 53 Haw. 32, 38, 487 P.2d 278, 282 (1971); see also Larson, 1B *Workmen's Compensation Law,* § 43.51 (1993) [hereinafter, Larson] ("The theory of [workers'] compensation legislation is that the cost of all industrial accidents should be borne by the customer as a part of the cost of the product. It follows that any worker whose services form a regular and continuing part of the cost of that product . . . is within the presumptive area of intended protection.").

Moreover, "[workers'] compensation laws are highly remedial in character. Their paramount purpose is to provide compensation for an employee for all work-connected injuries, regardless of questions of negligence and proximate cause. Courts should therefore give them a liberal construction in order to accomplish their beneficent purposes." *Evanson v. University of Hawai'i,* 52 Haw. 595, 600, 483 P.2d 187, 191 (1971) (emphasis added) (citations omitted).

*Mitchell v. State Dep't of Educ.*, 85 Hawai'i 250, 255, 942 P.2d 514, 519 (1997) (footnote omitted).

 Furthermore, HRS § 386–85 (1993) provides in relevant part that "[i]n any proceeding for the enforcement of a claim for compensation under this chapter it shall be presumed, in the absence of substantial evidence to the contrary: (1)[t]hat the claim is for a covered work injury." HRS § 386–1 (1993) defines "work injury" as "a personal injury suffered under the conditions specified in section 386–3," *see supra* note 4. This statutory presumption in favor of compensability supports the liberal construction of the Workers' Compensation Law. *Ostrowski v. Wasa Elec. Services, Inc.,* 87 Hawai'i 492, 496, 960 P.2d 162, 166 (App.1998). The presumption has been described as one of the "keystone principles" of our workers' compensation plan. *Iddings v. Mee–Lee,* 82 Hawai'i 1, 22, 919 P.2d 263, 284 (1996) (Ramil, J., dissenting).

HRS § 386–85(1) creates a presumption in favor of the claimant that the subject injury is causally related to the employment activity. As we previously explained in *Akamine,* this presumption imposes upon the employer both the heavy burden of persuasion and the burden of going forward with the evidence. 53 Haw. at 408, 495 P.2d at 1166. The claimant must prevail if the employer fails to adduce substantial evidence that the injury is unrelated to employment. The term "substantial evidence" signifies a high quantum of evidence which, at the minimum, must be "relevant and credible evidence of a quality and quantity sufficient to justify a conclusion by a reasonable man that an injury or death is not work connected." *Id.* at 408–9, 495 P.2d at 1166; *Survivors of Timothy Freitas v. Pacific Contractors Co.,* 1 Haw. App. 77, 85, 613 P.2d 927, 933 (1980).

The statute nowhere requires, as appellants suggest, some preliminary showing that the injury occurred "in the course of employment" before the presumption will be triggered. Rather, HRS § 386–85 clearly dictates that coverage will be presumed at the outset, subject to being rebutted by substantial evidence to the contrary. This is so in all claims proceedings, regardless of the existence of conflicting evidence, as the legislature has determined that where there is a reasonable doubt as to whether an injury is work-connected, it must be resolved in favor of the claimant. *Akamine, supra* at 409, 495 P.2d at 1166.

*Chung,* 63 Haw. at 650–51, 636 P.2d at 726–27.

In addition to the presumption of compensability, "the broad humanitarian purpose of the workers' compensation statute *read as a whole* requires that all reasonable doubts be resolved in favor of the claimant," *DeFries v. Ass'n of Owners,* [57 Haw. 296,] 304, 555 P.2d [855,] 860 [ (1976) ] (emphasis in original), for diseases arising from the nature of the employment are among the costs of production which industry must bear. *See Akamine v. Hawaiian Packing, supra,* 53 Haw. at 409, 495 P.2d at 1166. Thus, an injury is compensable if it reasonably appears to have resulted from the working conditions.

*Lawhead v. United Air Lines,* 59 Haw. 551, 560, 584 P.2d 119, 125 (1978) (holding that "a

disease or illness such as influenza is an injury within the meaning of HRS § 386–3").

Liberal construction and the presumption of compensability notwithstanding, workers' compensation law conditions an employer's liability for an employee's injury upon the injury's causal "nexus" to the job. *See, e.g., Holt v. Acme Mattress Co. & London Guarantee & Accident Co.,* 40 Haw. 660, 670, 675 (1955) (recognizing that "[t]he basic current problem in this area ... is the extremely difficult medico-legal question of causation" and that "[t]he workmen's compensation law is not designed as a complete substitute for life insurance, or sick and accident insurance, for employees, nor can sympathy be allowed to broaden its express statutory provisions") (citations and internal quotation marks omitted). This court has held that

> [f]or an injury to be compensable under a workers' compensation statute, there must be a requisite nexus between the employment and the injury. The nexus requirement is articulated in Hawai'i, as in the majority of jurisdictions, on the basis that, to be compensable, an injury must arise out of and in the course of employment.

*Tate v. GTE Hawaiian Tel. Co.,* 77 Hawai'i 100, 103, 881 P.2d 1246, 1249 (1994) (footnote omitted). In *Tate,* we explained that, in determining whether an injury meets this criterion,

> the court has adopted a "unitary" test that considers whether there is a sufficient work connection to bring the accident within the scope of the statute. First articulated in *Royal State National Insurance Co. v. Labor and Industrial Relations Appeal Board,* 53 Haw. 32, 487 P.2d 278 (1971), the work connection approach simply requires the finding of a causal connection between the injury and any incidents or conditions of employment. *Chung,* 63 Haw. at 648, 636 P.2d at 725 (citations omitted).

*Id.*

HRS § 386–3 provides that an injury "by accident" is compensable when the accident arises "out of or in the scope of the employment," but an injury "by disease" is compensable when the disease is "proximately caused by or resulting from the nature of the employment." Thus, the "nexus" requirement articulated in *Tate, see supra,* traces the language of the "injury-by-accident" prong of HRS § 386–3. Similarly, the "work connection" requirement, as articulated in *Tate,* expressly pertains to accidental injury. As far as we can determine, however, this court has never before construed the causation requirements applicable to the "injury-by-disease" prong of HRS § 386–3.

A disease "resulting from the nature of the employment" is, by definition, an "occupational disease." *See Komatsu v. Board of Trustees, Employees' Retirement System,* 5 Haw.App. 279, 284, 687 P.2d 1340, 1344 (1984) ("[A]n occupational disease is one 'which results from the nature of the employment, and by nature is meant ... conditions to which all employees of a class are subject, and which produce the disease as natural incident of a particular occupation, and attach to that occupation a hazard which distinguishes it from the usual run of occupations and is in excess of the hazard attending employment in general.'") (Quoting *Harman v. Republic Aviation Corp.,* 298 N.Y. 285, 82 N.E.2d 785, 786 (1948).) (Quoting *Goldberg v. 954 Marcy Corp.,* 276 N.Y. 313, 12 N.E.2d 311, 313 (1938).)) (Ellipsis points and brackets in original.), *vacated on other grounds,* 67 Haw. 485, 693 P.2d 405 (1984); *see also Department of Labor and Industries v. Kinville,* 35 Wash.App. 80, 664 P.2d 1311, 1314–15 (1983) (interpreting statute defining "occupational disease" as one arising "naturally and proximately" out of employment). Thus, injuries caused by an "occupational disease" are compensable pursuant to HRS § 386–3.

However, "[a]n ailment does not become an occupational disease simply because it is contracted on the employer's premises.... There must be a recognizable link between the disease and some distinctive feature of the claimant's job, common to all jobs of that sort." *Anderson v. General Motors Corp.,* 442 A.2d 1359, 1360 (Del.1982) (quoting *Harman,* 82 N.E.2d at 786). In other words, an ailment or disease is a compensable occupational disease if "the employ-

er's working conditions produced the ailment as a natural incident of the employee's occupation in such a manner as to attach a hazard distinct from and greater than the hazard attending employment in general." *Id.* at 1361. *See also Wood v. Harry Harmon Insulation,* 511 So.2d 690 (Fla.Dist.Ct.App. 1987) (to be compensable under occupational disease theory, disease must (1) actually be caused by employment conditions that are characteristic of and peculiar to particular occupation, (2) actually be contracted during employment in that occupation, and (3) have incidence substantially higher in that occupation than in usual occupations or, in case of ordinary disease of life, in general population); *Muir,* 519 S.E.2d at 591–92 (workers' compensation benefits for having contracted occupational disease are available, *inter alia,* when disease (1) is due to hazards in excess of those that are ordinarily incident to employment in general, (2) is peculiar to occupation in which claimant was engaged, and (3) results from claimant's actual exposure to working conditions of that occupation); *Hansen,* 602 A.2d at 562 (occupational disease is any disease (1) peculiar to the occupation in which employee was engaged and (2) due to causes in excess of ordinary employment as such, and it is compensable if it originated while employee was engaged in line of duty for employer); *Booker,* 256 S.E.2d at 196 (for occupational disease to be compensable under North Carolina statute, it (1) must have been due to causes and conditions that were characteristic of and peculiar to particular trade, occupation, or employment, (2) could not have been ordinary disease of life to which general public was equally exposed outside of that employment, and (3) must have been causally connected with that employment, which could be determined by circumstantial evidence such as extent of exposure to disease during employment, compared with exposure outside of employment and absence of disease prior to work-related exposure).

We hold that an employee's injury caused by a disease is compensable as an "injury by disease," pursuant to HRS § 386–3, when the disease (1) is caused by conditions that are characteristic of or peculiar to the particular trade, occupation, or employment, *Booker,* 256 S.E.2d at 196; *Wood,* 511 So.2d at 692, (2) results from the employee's actual exposure to such working conditions, *Muir,* 519 S.E.2d at 592, and (3) is due to causes in excess of the ordinary hazards of employment in general, *Hansen,* 602 A.2d at 562. In this connection, and pursuant to HRS § 386–85, the burden is on the employer seeking to avoid liability to demonstrate by substantial evidence that these conditions are not present.

B. *The "Date of Injury" In Occupational Disease Claims Under The Workers' Compensation Law*

HRS § 386–82 (1993)[6] establishes the time within which a claimant must file a claim under the Workers' Compensation Law. In *Hayashi v. Scott Company,* 93 Hawai'i 8, 994 P.2d 1054 (2000), we reiterated that, pursuant to HRS § 386–82, " 'the time period for notice or claim does not begin to run until the claimant, as a reasonable [person], should recognize the nature, seriousness and probable compensable character of his injury or disease.' " 93 Hawai'i at 12, 994 P.2d at 1058 (quoting *Demond v. University of Hawai'i,* 54 Haw. 98, 104, 503 P.2d 434, 438 (1972)) (brackets in original).

The Employers in the present matter initially contended that Flor's claims were untimely filed. For reasons not disclosed by the record, the parties stipulated that the LIRAB would not resolve the timeliness issue in its ruling on the Employers' motions for summary judgment. Nevertheless, we note that the statute of limitations on Flor's claims would not have begun to run until her discovery that she had contracted hepatitis C, *see Hayashi, supra,* which, she asserts, occurred on April 17, 1996—Flor's self-iden-

---

6. HRS § 386–82 provides in relevant part: The right to compensation under this chapter shall be barred unless a written claim therefor is made to the director of labor and industrial relations (1) within two years after the date at which the

effects of the injury for which the employee is entitled to compensation have become manifest, and (2) within five years after the date of the accident or occurrence which caused the injury.

tified date of "injury" for purposes of filing her claims.

Occupational disease cases typically show a long history of exposure without actual disability, culminating in the *enforced cessation* of work on a definite date. In the search for an identifiable instant in time which can perform such necessary functions as to start claim periods running, establish claimant's right to benefits, determine which year's statute applies, and fix the employer and insurer liable for compensation, the date of disability has been found the most satisfactory. Legally, it is the moment at which the right to benefits accrues; as to limitations, it is the moment at which in most instances the claimant ought to know he has a compensable claim; and, as to successive insurers, it has the one cardinal merit of being definite, while such other possible dates as that of the actual contraction of the disease are usually not susceptible to positive demonstration.

*Lowery v. McCormick Asbestos Co.*, 300 Md. 28, 475 A.2d 1168, 1174 (1984) (quoting Larson, § 95.21 (1981)) (emphasis added).

 Flor did not actually cease working until May 4, 1996. Thus, her "date of disability," as construed pursuant to *Lowery*, would be May 4, 1996. Flor herself designated May 4, 1996 as the "date disability began." However, April 17, 1996 was the date on which Flor recognized the "nature, seriousness[,] and probable compensable character," *Hayashi*, at 12, 994 P.2d at 1058, of her disease. It is undisputed that her ultimate cessation of work was "enforced" by her hepatitis C. The *Hansen* court noted that hepatitis "itself is an impairment in capacity because it disabled [the] claimant from employment as a dental hygienist and therefore caused her to lose earnings." *Hansen*, 602 A.2d at 566. In the present case, the LIRAB entered no express FOFs as to the effect of Flor's April 17, 1996 discovery of her diagnosis on her employability. However, even if the diagnosis did not directly precipitate the cessation of her employment, the record reflects, at the very least, that the diagnosis contributed to Flor's retirement, inasmuch as

her physicians recommended that she cease working.

The date on which a claimant becomes totally disabled is a question of fact for the referee to determine on the basis of the evidence. *Novak v. Mathies Coal Co.*, [29 Pa.Cmwlth. 122, 370 A.2d 435, 436–37 (1977)]. The date disability begins is not automatically the date of last exposure [to an occupational hazard] or the date on which claimant is examined and determined by his doctor to be disabled.... *Novak v. Mathies Coal Co., supra.*

*Gateway Coal Co. v. Workmen's Compensation Appeal Board*, 36 Pa.Cmwlth. 608, 388 A.2d 1122, 1124 (1978).

The [worker's compensation] board may set as the date of disablement the date on which physical impairment in the nature of occupational disease was diagnosed. Where no medical finding of occupational disease is initially made but such condition is established upon later diagnosis, the board may properly set the date of the later diagnosis as the date of disability.

*Barnett v. Edmur Baking, Inc.*, 37 A.D.2d 653, 322 N.Y.S.2d 473, 475 (N.Y.App.Div. 1971) (citing *Zambrona v. Renell Bake Shop, Inc.*, 34 A.D.2d 707, 309 N.Y.S.2d 758, 760 (N.Y.App.Div.1970)). *See also Liberty Mut. Ins. Co. v. Commercial Union Ins. Co.*, 978 F.2d 750, 758–59 (1st Cir.1992) (holding that, for purposes of Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. §§ 901–950 (1988), liability for effects of occupational disease falls upon last responsible insurer on date of disability, as determined by date of decreased earning capacity, which may coincide with date of diagnosis despite absence of outward physical symptoms).

 The determination of the precise date on which a claimant has become disabled due to an occupational disease is a factual determination to be made by the Director based on the circumstances of each case. However, the record in the present matter indicates that Flor's cessation of work was directly related to her discovery of her hepatitis C diagnosis on April 17, 1996, and, accordingly, the Director may consider that date to be Flor's "date of disability" for

purposes of establishing (1) the statute of limitations period applicable to her claims pursuant to HRS § 386–82, (2) the date on which her right to benefits began to accrue for purposes of computing her weekly permanent disability benefit rate, as prescribed in HRS § 386–31 (1993) and (3) which year's version of the Workers' Compensation Law is applicable. *Lowery,* 475 A.2d at 1174.[7]

It is generally held under workmen's compensation acts that injury results when the right to compensation arises. Injury and compensable disability are more in the nature of synonymous terms than are date of injury and date of the accident. Thus, in *Esposito v. Marlin–Rockwell Corp.,* [96 Conn. 414,114 A. 92, 94 (Conn.1921) ], it is said: "A compensable injury is an injury for which compensation is payable, and the date of such an injury is not the time of the accident or occurrence causing the injury, but the time … when the right to compensation accrues."

*In Re Palama,* 34 Haw. 65, 71, 1937 WL 4432 (1937) (quoting *Acme Body Works v. Koepsel,* 204 Wis. 493, 234 N.W. 756, 758 (Wis.1931)).

■ We hold that a claimant in a case arising under the "injury-by-disease" prong of HRS § 386–3 may rely upon the foregoing "date of disability," which typically is the last day of employment but, as indicated *supra,* may also be the date of diagnosis of the disabling condition, in order to identify the "date of injury" required by the DLIR in connection with the filing of a workers' compensation claim. Flor was therefore justified in identifying either the date on which she learned of her diagnosis (*i.e.,* April 17, 1996) or the date on which she ceased working (*i.e.,* May 4, 1996) as the "date of injury" on her claim form. *Cf. Nelson v. Industrial Comm'n,* 120 Ariz. 278, 585 P.2d 887, 890–91 (Ariz.Ct.App.1978) (holding that "the 'date of injury' in an occupational disease claim must be viewed as the date the claimant, in the exercise of reasonable diligence, discovers a relationship between a disabling condition and employment"); *Chavira v. Workers' Compensation Appeals Bd.,* 235 Cal.App.3d

463, 286 Cal.Rptr. 600, 605–06 (1991) (noting legislative codification of proposition that, "in the case of a progressive occupational disease, the date of injury is the date on which disability occurs and by reasonable diligence the employee can discover the disability was industrially caused"); *King v. District of Columbia Dep't of Employment Servs.,* 742 A.2d 460, 471–72 (D.C.1999) (noting that *Railco Multi–Construction Co. v. Gardner,* 564 A.2d 1167, 1168 (D.C.1989), "adopted a rule that the time of injury is normally deemed to be when the employee is first aware of the injury and its relationship to the employment"); *Garcia v. Travelers Indem. Co. of Rhode Island,* 892 F.Supp. 153, 157 (W.D.Tex.1995) (quoting Texas labor code for proposition that "the date of injury for an occupational disease is the date on which the employee knew or should have known that the disease may be related to the employment").

On remand, the Director will be required to determine Flor's "date of disability" for the purposes enumerated in this section. However, regardless of the outcome of that determination, Flor's workers' compensation claim was not foreclosed by the fact that she identified a different date as the "date of injury" on her claim form.

### C. Application Of The Workers' Compensation Law To Flor's Occupational Disease Claim

■ Because Flor did not press the fiction that she had actually contracted hepatitis C either on April 17, 1996 or on January 12, 1994 (*i.e.,* second date that Flor initially identified on her claim form as the "injury date"), and because she was, in fact, willing to acknowledge that she had not contracted the virus on those dates, the LIRAB found that Flor "did not sustain or suffer any injury" on either of those dates. The LIRAB therefore mechanistically concluded, *a fortiori,* that Flor had not sustained an injury "arising out of or in the course of her employment" with the Employers on those dates and that, as a consequence, the Employers were entitled to summary judgment

---

**7.** We defer the discussion of the "identifiable instant in time to … fix the employer and insur-

er liable for compensation" to section III.D, *infra.*

against Flor on her workers' compensation claims. In doing so, the LIRAB erred for several reasons.

First, as we have noted, an injury caused by a disease is compensable under the Workers' Compensation Law when the disease is "proximately caused by or result[s] from the nature of the employment." *See* HRS 386-3, *supra* note 4. The statute does not speak of injuries generically "arising out of and in the course of employment," but, rather, of "personal injury . . . by accident . . . or by disease." *Id.* The distinction between the injury itself and the occurrence giving rise to it may not be significant when the occurrence is an "accident" because the injury generally manifests itself contemporaneously with the accident causing it. However, the distinction is critical when the occurrence gives rise to a disease. As we indicated *supra* in section III.A, a worker's compensation claim premised on a disease such as hepatitis C, should, in general, be deemed an "injury-by-disease" claim. The LIRAB's COL treated Flor's "injury by disease" claim as if it involved an "injury by accident."

Second, the LIRAB erred in finding that there was no genuine issue of material fact as to whether Flor had suffered an "injury" on April 17, 1996, inasmuch as the factual questions regarding the relationship between Flor's hepatitis C diagnosis and both her employability as a dental hygienist and her ability to work in general were not resolved. Moreover, as discussed *supra* in section III.B, Flor's workers' compensation claim was not foreclosed merely because she asserted that the date on which she discovered her disease was the date of injury.

Third, the LIRAB mistakenly assumed that the unknown date on which Flor first contracted the hepatitis C virus was the "date of injury." Obviously, the contracting of a virus does not, in and of itself, constitute a compensable injury. A compensable injury—*i.e.*, a disability from work—typically occurs well after the virus has first entered the claimant's bloodstream. This is especially true in the case of a virus, such as hepatitis C, that remains asymptomatic for decades and, indeed, may never manifest itself. Accordingly, whether Flor contracted the virus on the precise date of her claimed injury is not dispositive of the compensability of her claim.

Finally, fourth, the LIRAB failed to apply the statutory presumption, set forth in HRS § 386-85, in favor of the compensability of Flor's claim. In this connection, the medical opinions adduced by the parties corroborated, rather than rebutted, the proposition that Flor's risk of contracting hepatitis C as a dental hygienist exceeded the risk of contracting the disease by virtue of employment or life in general. Moreover, the medical opinions proffered by the Employers suggested, at most, an inability to pinpoint the precise cause of Flor's hepatitis C. Such opinions were insufficient to rebut the presumption that Flor's employment as a dental hygienist contributed to the development of her disease. *See Jeannette District Memorial Hospital*, 668 A.2d at 251–52 (evidence that hospital nurse suffered hepatitis C raised rebuttable presumption that her disability was work-related, and presumption was not rebutted by expert testimony of hospital's witnesses that they were unable to determine cause of claimant's illness); *see also Akamine*, 53 Haw. at 409–15, 495 P.2d at 1167–68 (physician's testimony that (1) heart diseases originate relatively early in life, (2) pre-existing pathological conditions must have spurred claimant's heart attack, and (3) heart attack could just as well have occurred elsewhere than at work did not rebut presumption of compensability when physician testified that he did not know whether heart attack was related to claimant's work activity). In fact, some of the physicians' proffered opinions acknowledged that Flor *probably* acquired the virus by virtue of her employment as a dental hygienist. Accordingly, the Employers failed to carry their burden of demonstrating by substantial evidence that Flor's claim was not compensable. That being the case, we hold that Flor's disability, caused by hepatitis C, is *compensable* under the Workers' Compensation Law, inasmuch as the Employers failed to demonstrate by substantial evidence that Flor's disease (1) was not caused by conditions that were characteristic of or peculiar to her employment as a dental hygien-

ist, (2) did not result from her actual exposure to such conditions, and (3) was not due to causes in excess of the ordinary hazards of employment in general. *See supra* section III.A.

■ Nevertheless, the Employers argue that, because some of the physicians opined that Flor probably acquired the virus during the early 1980s—or even in the 1970s—, the employers for whom Flor commenced employment *after* those time periods lacked a sufficient connection with her disability to be liable for the payment of any workers' compensation benefits. This argument would more properly be raised by the Employers in a proceeding regarding allocation of liability among Flor's employers and/or the Special Compensation Fund, *see infra* note 10, for her compensation. However, we offer the following observations:

> "[A] medical man may give a generalized opinion that there was no connection between an incident at work and a heart attack, and, in his own mind, may mean thereby that a pre-existing pathological condition was the overwhelming factor in bringing about the attack and that the part played by the work was insignificant. But, while it may be sound medically to say that the work did not 'cause' the attack, it may well be bad law, because, in general, existing law treats the slightest factor of aggravation as an adequate 'cause.'" McNiece, *Heart Disease and the Law* 135 (1961).

[*Akamine,*] 53 Haw. at 410, 495 P.2d at 1167. The primary focus of medical testimony for the purposes of determining legal causation should be whether the employment situation in any way contributed to the employee's injury. *Id.* at 412, 495 P.2d at 1168. Testimony that a pre-existing heart disease may have been a contributing or precipitating cause of the heart attack should be accorded little probative weight. *Id.* The only relevant inquiry is whether [claimant's] heart attack in fact was aggravated or accelerated by his work activity. *Id.* at 413, 495 P.2d at 1169. *Chung,* 63 Haw. at 652, 636 P.2d at 727–28. The same principles apply in the case of an injury caused by a disease such as hepatitis C.

While it may be true that Flor was first exposed to the hepatitis C virus early in her career as a dental hygienist, the record establishes that her contact with potentially contaminated blood continued throughout her employment with the Employers. The testimony adduced by the parties focused on the time when Flor originally contracted the disease. However, nothing in the record suggests that subsequent exposures did not contribute to the ongoing progression of the disease. Ultimately, the cause of Flor's hepatitis C and its precise relationship to each of her employers remains unknowable. None of the Employers, however, carried their burden of demonstrating that Flor's employment with them did not contribute to her disability.

### D. *Apportionment Of Liability Among Employers*

■ On remand, the Director will be faced with the task of determining which of the Employers are liable for the payment of Flor's workers' compensation benefits and the allocation of such liability. We note that the Workers' Compensation Law does not contain any express provisions regarding apportionment of liability among multiple employers. *See Kalapodes v. E.E. Black, Ltd.,* 66 Haw. 561, 563 n. 1, 669 P.2d 635, 637 n. 1 (1983).

In *Kalapodes,* the claimant sustained back injuries while in the employ of several consecutive employers, ultimately resulting in a permanent disability from work. He initially filed a workers' compensation claim against his last employer, but later joined the previous employers. The LIRAB determined that twenty-five percent of Kalapodes's disability was due to the injury received while working for one employer, five percent was due to the injury received while working for another, and the remaining seventy percent was not work-related, and ordered that the two employers pay him corresponding permanent partial disability compensation in accordance

with HRS § 386–32(a) (1976) [8] and, pursuant to HRS § 386–33 (1976),[9] ordered the special compensation fund to pay the remaining seventy percent of his compensation. On appeal, the employers argued that the LIRAB was not authorized to apportion workers' compensation liability among successive employers. We affirmed, holding that the LIRAB did not actually "apportion" liability for Kalapodes's total disability, but, rather, determined the degree of permanent partial disability that Kalapodes had sustained as a result of each of his work-related injuries as if they were separate claims adjudicated in one consolidated hearing. *Id.* at 563–64, 669 P.2d at 637.

▆ In the context of workers' compensation claims arising out of injury caused by an occupational disease, we have noted in the past that the LIRAB has adopted the "last injurious exposure" rule to assign liability as between successive employers of the claimant. *Miyake v. Welders, Inc.*, 71 Haw. 269, 271, 788 P.2d 170, 171 (1990). *See also Survivors of Kinichi Gushikien, Deceased, v. Central Pacific Boiler and Piping and Hawaiian Ins. and Guaranty Co.*, Case No. AB 82–2 (LIRAB 1984), published in 84–1 Haw. Legal Rep. 84–0691 (1984). The "last injurious exposure rule" imposes "full liability for [workers'] compensation benefits on the employer or insurance carrier at the time of the employee's last exposure to a cause of the disabling disease[.]" *Beason v. Red Ball Oxygen Co., Inc.*, 702 So.2d 26, 28 (La.Ct.App. 1997) (citing *Gales v. Gold Bond Bldg. Products*, 493 So.2d 611 (La.1986)). "Pursuant to the last [injurious] exposure rule, determination of liability is not dependent upon the date of disability. The last [injurious] exposure rule is not a rule of causation. Instead, ... liability falls on the last employer to expose [c]laimant to the occupational hazard for which claim is made." *Crabill v. Hannicon*, 963 S.W.2d 440, 444 (Mo.Ct.App.1998) (citing *Johnson v. Denton Const. Co.*, 911 S.W.2d 286, 288 (Mo.1995)).

The last injurious exposure rule is the *majority rule in successive employer or insurer cases*, either by judicial adoption or by express statutory provision. Larson [Workmen's Compensation Law], *supra* § 95.20 [ (1984) ]. It has been utilized in occupational disease cases including those involving asbestosis, silicosis, pneumoconiosis, tuberculosis, arthritis, dermatitis, occupational loss of hearing, and various other diseases produced by inhalation of chemicals and fumes. *Id.* at § 95.24. The last injurious exposure [rule] is particularly useful for allocating liability in occupational disease cases, which often involve a number of employers and insurers. *Id.*

The rule avoids the necessity for identification of all employers and insurers as well as the assessment of the proportion of exposure during each employment and thereby prevents frequent and protracted delays in payments to claimants. *See, Lowery v. McCormick Asbestos Company*, 300 Md. 28, 475 A.2d 1168, 1174 ; *Inkley v. Forest Fiber Products Company*, 288 Or. 337, 605 P.2d 1175 (1980) and Larson, *supra*, § 95.24. Most courts have felt constrained to interpret the workers' compensation laws to adopt such a rule so as to best serve the interests of employees who

---

8. HRS § 386–32(a) (1976) provided in relevant part:

> In cases in which the permanent partial disability must be rated as a percentage of total loss or impairment of physical or mental function of the whole man the maximum compensation *shall be computed on the basis of the corresponding percentage of the product of 312 times the effective maximum weekly benefit rate prescribed in section 386–31.*

A substantially identical provision is contained in the current Workers' Compensation Law. *See* HRS § 386–32(a) (1993 & Supp.1999).

9. HRS § 386–33 (1976) provided in relevant part:

> If an employee receives an injury which of itself would cause a permanent partial disability but which, combined with a previous disability, results in a greater permanent partial disability or in permanent total disability, the employer shall pay compensation only for such disability as would have been caused by the injury without the previous disability. The employee shall be entitled to full compensation for his actual permanent partial or total disability, and, after receipt of the compensation payable by the employer, weekly payments of the balance of the compensation to which the employee is entitled shall be made out of the special compensation fund by orders of the director of labor and industrial relations.

suffer from occupational disease, rather than to attempt an adjustment of their rights in the light of equities that may exist *between successive employers*. *See Wilson v. Van [Buren] Burner County*, 198 Tenn. 179, 278 S.W.2d 685 (Tenn.1955). Even though the liability imposed under this rule can have a harsh result in a particular case, it is believed that there will be a spreading of the risk when the total picture of occupational disease litigation is considered on an industry-wide, long term basis. *Osteen v. A.C. & S., Inc.*, 209 Neb. 282, 307 N.W.2d 514 (1981); *Cordero v. Triple A Machine Shop*, 580 F.2d 1331 (9th Cir.1978); *Travelers Insurance Company v. Cardillo*, 225 F.2d 137 (2nd Cir. 1955); *Lowery, supra;* and *Larson, supra,* § 95.24.

Another possible solution to the *successive employer or carrier* problem would be to apportion liability among all causative employers and their insurers on the basis of the employee's proportionate exposure to causative factors during each employment or coverage. As Professor Larson observes, this "would be the ideal theory in a perfect world, *i.e.*, a world in which all previous insurers were within the jurisdiction of the board, and the proportion of disability which occurred when each was at risk could be easily measured." Larson [at] § 95.12 (footnotes omitted). In sum-

ming up the problems and complications of the apportionment solution, he states:

> Obviously, however, this isn't a perfect world and apportioning liability is complicated by such problems as out-of-state employers, statutes of limitations, and the difficulty of determining the proportion of liability attributable to each insurer. This latter problem is further complicated by the necessity of determining who—the insurers or the employee—is to bear the burden of establishing the basis for apportionment. Nonetheless, apportionment is a frequently used solution.

*See also, Osteen v. A.C. & S., Inc.*, 209 Neb. 282, 307 N.W.2d 514, 519 (1981); *Tennessee Tufting Company v. Potter,* [206 Tenn. 620] 337 S.W.2d 601, 602 (Tenn. 1960); *Employers' Mutual Liability Insurance Company v. McCormick,* 195 Wis. 410, 217 N.W.738, 742 (1928); and *Mathis v. State Accident Insurance Fund,* 10 Or. App. 139, 499 P.2d 1331 (1972).

> The last injurious exposure rule avoids most of the problems of the apportionment solution and because of this promotes efficient administration, speedy payment of claims, and, in most instances, provides the highest level of benefits for the claimant.

*Gales*, 493 So.2d at 616–17 (emphases added).

The Louisiana Supreme Court's reasoning is persuasive. We note that, in amending HRS § 386–33 in 1982,[10] our legislature

---

**10.** *Compare* HRS § 386–33 (1976), *supra* note 8, *with* HRS § 386–33 (1993 & Supp.1999), which provides in relevant part:

(a) Where prior to any injury an employee suffers from a previous permanent partial disability already existing prior to the injury for which compensation is claimed, and the disability resulting from the injury combines with the previous disability, whether the previous permanent partial disability was incurred during past or present periods of employment, to result in a greater permanent partial disability or in permanent total disability or in death then weekly benefits shall be paid as follows:

(1) In cases where the disability resulting from the injury combines with the previous disability to result in greater permanent partial disability the employer shall pay the employee compensation for the employee's actual permanent partial disability but for not more than one hundred four weeks; the balance if any of compensation payable to the employee for the employee's actual

permanent partial disability shall thereafter be paid out of the special compensation fund; provided that in successive injury cases where the claimant's entire permanent partial disability is due to more than one compensable injury, the amount of the award for the subsequent injury shall be offset by the amount awarded for the prior compensable injury;

(2) In cases where the disability resulting from the injury combines with the previous disability to result in permanent total disability, the employer shall pay the employee for one hundred four weeks and thereafter compensation for permanent total disability shall be paid out of the special compensation fund; and

. . . .

(b) Notwithstanding subsection (a), in the case of permanent total disability or death, where the director or the appellate board determines that the previous permanent partial disability amounted to less than that necessary

adopted a simplified scheme of apportionment in special compensation fund proceedings reflecting the goal of reducing litigation and its accompanying costs.

[T]he legislature stated:

The purpose of this bill is to reduce the cost of administering workers compensation claims in those cases where the employee before his work injury suffers from a previous disability. While the bill will reduce administrative and legal costs connected with workers' compensation claims, it will not reduce benefits paid to injured employees.

. . . .

Your Committee finds that Section 33 in its existing form contributes to the cost of workers' compensation by introducing uncertainty as to whom should bear liability for work injuries, by encouraging litigation and by encouraging appeals to the Labor and Industrial Relations Appeals Board.

The section in its present form requires the director or the Appeals Board as the case may be to make a hypothetical and inherently difficult decision whenever a work injury combines with a previous disability to result in greater permanent partial or in permanent and total disability. In such cases the director or the board must quantify that disability which would have resulted from the injury without the previous disability. Often this determination is extremely difficult. Physicians frequently are unable to quantify the impairment before an injury and often disagree among themselves. Thus a good deal of uncertainty is injected into workers' compensation cases making settlements less likely and promoting costly litigation.

The existing provisions of Section 33 also contribute to the cost of administering workers' compensation claims by providing a strong incentive to employers to conduct an exhaustive search of the employee's entire medical history in the hope of finding a previous disability. If earlier injuries or health problems are turned up, litigation

with the Special Compensation Fund ensues.

*Bumanglag,* 78 Hawai'i at 281, 892 P.2d at 474 (quoting Sen. Stand. Comm. Rep. No. 215–82, 1982 Senate Journal, at 1040–41) (ellipsis points in original) (emphasis omitted). The legislature's preference for low-cost, simplified procedures in adjudicating workers' compensation claims militates, as a general rule, against apportioning liability among responsible employers and/or insurers when employment with multiple successive employers has contributed to the progression of an employee's occupational disease.

The virtue, such as it is, of the last injurious exposure rule lies not in achieving individualized justice, but, rather, in the utility of spreading liability fairly among employers by the "law of averages" and in reducing the risk and cost of litigation. *Bracke v. Baza'r,* 293 Or. 239, 646 P.2d 1330, 1336 (1982). The rule serves to designate an identifiable event for the assignment of liability for the sake of reducing uncertainty "in a way which is somewhat arbitrary." *Id.* at 1337. However, "[t]here is no reason to apply the rule with any greater arbitrariness than is required to achieve its purposes." *Id.* at 1337 n. 5. In the absence of difficulty in identifying a definite and certain moment for liability to attach, the rule has no useful application. *Singer Co. v. Smith,* 362 So.2d 590, 593 (Miss.1978); *see also Port of Portland v. Director, Office of Workers Compensation Programs,* 932 F.2d 836, 840–41 (9th Cir. 1991) (holding that under last injurious exposure rule, followed by federal courts interpreting LHWCA, no liability can be imposed on employer who could not, even theoretically, have contributed to causation of disability); *Parks v. Flint Steel Corp.,* 755 P.2d 680, 683 (Okla.1988) ("[t]he rule cannot be used to hold claimant's subsequent employer responsible for compensation for claimant's disability, which, according to the unrefuted medical evidence, was caused by and arose during claimant's [prior employment]").

to support an award of thirty-two weeks of compensation for permanent partial disability there shall be no liability on the special compensation fund, and the employer shall pay the

employee or the employee's dependents full compensation for the employee's permanent total disability or death.

In *Bond[ v. Rose Ribbon & Carbon Mfg. Co.,* 42 N.J. 308, 200 A.2d 322 (1964) ], the [New Jersey Supreme] Court considered the problem of assessing liability for an employee's occupational disease where the inception of that disease cannot be accurately pin-pointed and the employee worked for successive employers or was covered by successive insurance carriers. In doing so, the Court said:

> Where, as here, an employee is exposed to work conditions which activate or cause a progressive occupational disease, and the existence of such disease remains undisclosed and unknown over a period of time, it is impossible upon ultimate revelation of its existence by medical examination, work incapacity, or manifest loss of physical function, to pinpoint in retrospect, the triggering date of such activation or inception. It is also impossible to reconstruct the daily rate of progress of the disease from its genesis to discovery through one of the afore-mentioned means, where such employee continues to be exposed to work conditions which aggravate the existing disease in unascertainable stages. It follows that where the employment under such work conditions was under the aegis of successive employers or insurance carriers, from initial infection or activation to discovery or manifestation, it is impossible to accurately determine the inception and the rate of progress of the disease during such respective periods of employment or insurance coverage. Therefore, any apportionment of compensation liability between the successive employments or insurance coverages, must of necessity be speculative and arbitrary. To avoid the morass into which litigation would be pitched were apportionment required, and to eliminate the recognized unsatisfactory nature of any such attempted ascertainment, we conceive that the most workable rule and the most consistent with the philosophy and public policy of the Worker's Compensation Act is to hold liable that employer or carrier during whose employment or coverage

the disease was disclosed as above noted, *i.e.,* by medical examination, work incapacity, or manifest loss of physical function. Although this test is admittedly arbitrary and may on occasion cause some apparently unfair results, over the years it should result in an equitable balancing of liability. Under the circumstances we conceive it to be the fairest and most workable thesis. [42 N.J. at 311, 200 A.2d 322]....

The Supreme Court clarified *Bond* in *Giagnacovo v. Beggs Bros.,* [64 N.J. 32, 311 A.2d 745 (1973) ]. There the Court held that two of the stated criteria for manifestation of an occupational disease under *Bond, i.e.,* medical examination and manifest loss of physical function, "represent in substance two methods of revelation of a specific degree of physiological pathology—one which is fixed, arrested and definitely measurable." *Id.* at 38, 311 A.2d 745. And *see Akef v. BASF Corp.,* [140 N.J. 408, 658 A.2d 1252 (1995) ] ("[w]hen there is evidence that a condition underlying a disability was obvious, diagnosable and capable of measurement, compensation for the resultant disability should be apportioned to or among those employers ... to cover the periods of prior employments during which the underlying condition was discoverable and measurable." ... ).

*Levas v. Midway Sheet Metal,* 317 N.J.Super. 160, 721 A.2d 724, 729–30 (Ct.App.Div. 1998) (holding (1) that final employer was not completely liable for total disability caused by pulmonary occupational disease that manifested itself during previous employment as partial disability and (2) that allocation of liability among employers who contributed to condition was required) (some brackets added and some in original).

In our view the legislature is in a better position to determine what circumstances require [equitable] apportionment than we are. In the absence of a specific statute on the subject, however, it would appear to us to be applicable only in those rare cases in which substantial and almost uncontroverted medical testimony will permit a precise allocation of responsibility between or among different employers or insurers for

the employee's disability. In any event, in any case in which the employment immediately preceding the employee's temporary total disability is conceded to have been a contributing cause of such disability, the employee is entitled to receive full benefits promptly from the insurer then furnishing compensation coverage, whether or not the right to equitable apportionment against a former insurer or employer may exist. *Michels v. American Hoist & Derrick*, 269 N.W.2d 57, 59 (Minn.1978). *See also Atlas Elec. Indus. v. Workmen's Compensation Appeal Bd.*, 72 Pa.Cmwlth. 476, 457 A.2d 158 (1983) (holding that "where . . . the current state of medical science cannot apportion an insidious disease among its several causative factors, the more recent employer will be held solely liable for an employee's total disability 'because it subjected him to a hazard which contributed to the disability' "); *Pacher v. Fairdale Farms*, 166 Vt. 626, 699 A.2d 43 (1997) (holding that last injurious exposure rule is appropriate "only where separate injuries all causally contribute to the total disability so that it becomes difficult or impossible to allocate liability among several potentially liable employers" and affirming apportionment where liability of each employer could be fairly defined without confusion either to employers or to employees).

■■■ We hold that if an employee's occupational disease is medically diagnosed and ultimately causes the employee's work disability, then the employer and/or its insurer at the time of such diagnosis are liable for the payment of the employee's workers' compensation benefits.[11] We further hold that subsequent employer and/or its insurer at the time of the employee's diagnosis, are solely liable only if the contribution of the subsequent employment to the development of the disability is established by medical evidence and there is no rational basis for apportionment. Finally, we hold that if the medical evidence establishes a rational basis upon which to apportion liability among successor and/or predecessor employers and/or their insurance carriers and the apportionment will serve the interests of fairness to both the employers and the employee entitled promptly to receive the compensation, then the Director is authorized to order such an apportionment.

■■■ In the present matter, Flor's hepatitis C was actually and conclusively diagnosed on January 12, 1994. Thus, her employers on that date are liable for the payment of the benefits relating to the claim that had accrued by the time the condition caused her to cease employment on May 4, 1996. However, the record reflects uncertainty as to the time and source of Flor's initial infection and the possible contribution of Flor's various employers to the disease's development. Consequently, we do not believe that there is a basis for an apportionment of liability that would be less arbitrary than holding liable the employers at risk at the time of the diagnosis of Flor's hepatitis C.

The foregoing analysis has been focused on determining the relevant date for purposes of assigning liability to Flor's employers. We have applied a modified version of the last injurious exposure rule in holding that Flor's employers and/or their insurers as of Janu-

11. We emphasize that, under the last injurious exposure rule, the "determination of liability is not dependent upon the date of disability," *Crabill*, 963 S.W.2d at 444. In most cases, the employer on the "date of disability," as construed *supra* in section III.B, will be the employer liable pursuant to the last injurious exposure rule. This is because, in a typical case, the discovery of the condition precluding or limiting employment ("date of disability") is contemporaneous with the actual cessation of the employment that contributed to the development of the condition ("last injurious exposure"). However, there may be other scenarios. For instance, when disability manifests itself in an employment that could not have contributed to it, but a prior employment in fact did so, the prior employer is liable under the last injurious exposure rule, but the date of disability is the later date of diminished earning capacity. *See Port of Portland, supra; Liberty Mut. Ins. Co., supra.* Under the circumstances of the present case, the disabling condition (hepatitis C) was diagnosed with medical certainty more than two years before Flor's cessation from work. The date of cessation from work, or the closely related date of communication of the diagnosis, is the "date of disability," *see supra* section III.B. Applying the usual "last injurious exposure rule," liability would have attached to the employers "at risk" on that date. However, for the reasons explained in this opinion, we hold that a modification of the rule is appropriate, so that the employers on the date of the original diagnosis are liable.

ary 12, 1994 are liable for the payment of the benefits to which her claim entitles her. Inasmuch as, on that date, Flor was concurrently employed by three dentists, who were insured by two carriers, the Director will be required to determine the liability of each of those employers for her workers' compensation benefits.

The last injurious exposure rule is not helpful in resolving the additional and distinct matter of apportioning the liability of multiple and *concurrent* (as opposed to *successive*) employers. *Riverboat Hotel Casino v. Harold's Club,* 113 Nev. 1025, 944 P.2d 819, 823 (1997). "[T]he [last injurious exposure] rule makes complete sense in the context of successive employments which contribute to an occupational disease; it makes little sense in the present context, where the worker was exposed to conditions which contributed to her occupational disease in two separate but simultaneous employments." *Id.* (quoting *Colwell v. Trotman,* 47 Or.App. 855, 615 P.2d 1094, 1096 (1980) (noting that distinction between "successive" employments and "concurrent" ones can become blurred but reversing agency decision to place full liability for dental hygienist's elbow condition, which was developed while working for two dentists—one on Tuesdays and another on Wednesdays, Thursdays, and Fridays—on the Wednesday through Friday employer when the employee's last day of work was Friday and the agency applied last injurious exposure rule)).

The apportionment of liability among concurrent employers involves an exercise in fact-finding. *Id.* at 824 (citing Larson, § 48.50 (1996)). The Nevada Supreme Court, in *Riverboat Hotel Casino, supra,* held that, in *concurrent* employment situations, apportionment on the basis of each employer's responsibility for wages was appropriate and that the employers were responsible for the injured employee's claim in the same proportion as they contributed to her overall wages. *Id.* Similar results have been reached by several other courts. In *Timmons, supra,* the claimant was a dental hygienist, who worked part-time for two dentists from September 1991 until she was diagnosed with hepatitis B in February 1992.

It was uncontested that hepatitis B was an occupational disease for health care workers, but both employers asserted that Timmons could not meet her burden of proving the particular dental office at which she had contracted the virus. The medical expert testimony established that Timmons, who tested negative for hepatitis B in January 1991 and did not present any risk factors other than her employment as a dental hygienist, had acquired the virus while in the employ of one of the dentists for whom she had worked since September 1991, but that it was impossible to determine which of the dentists it was or from which precise patient the disease had been contracted. The *Timmons* court held that

> when an employee contracts an occupational disease while doing similar work for two concurrent employers, one employer can be held liable for the employee's workers' compensation benefits only if it can be shown that the occupational disease was contracted as a result of the employee's work for that one specific employer. However, if it cannot be determined whether the employee contracted the occupational disease from a specific employer, then both concurrent employers are liable. Any other result would violate the public policy of compensating employees for injuries sustained while working in the course of his or her employment. Apportionment of liability between two concurrent employers is a factual determination appropriately made by the Board.

652 A.2d at 1083. The *Timmons* court therefore affirmed the apportionment of liability between the two employers in accordance with their wage liability. *See also Clemmer v. Carpenter,* 98 N.M. 302, 648 P.2d 341 (Ct.App.1982); *Holdren v. Lease Management, Inc.,* 61 Mich.App. 508, 233 N.W.2d 59 (1975) (holding that joint employers of worker injured in accident were liable for compensation award in proportion to employee's earnings); *but see Oilfield Safety and Machine Specialties, Inc. v. Harman Unlimited, Inc.,* 625 F.2d 1248 (5th Cir.1980) (dual employers are jointly and severally liable for compensable injuries under LHWCA).

**92**

We note that the Workers' Compensation Law provides for apportionment of liability for an injured employee's benefits between the employer and the special compensation fund when the employee is concurrently employed in more than one employment and sustains an injury while working for one of the employers. *See* HRS § 386–51.5 (Supp. 1999).[12] However, the statute does not address the circumstance of multiple concurrent employers being simultaneously liable for the employee's benefits.

■ We hold that in those circumstances, the Director may apportion liability among the liable employers. Furthermore, we agree with the courts that have approved the apportionment of liability in proportion to the wages earned by the employee in the employ of each of those employers. Such a rule is consistent with the general principle that workers' compensation disability benefits are determined on the basis of the employee's weekly earnings, *see* HRS § 386–31, and it is simple to apply, thereby reducing the risk and cost of the litigation respecting the liability of each of the concurrent employers.

## IV. *CONCLUSION*

Based on the foregoing analysis, we vacate the LIRAB's orders granting the Employers' motions for summary judgment and remand to the Director for further proceedings consistent with this opinion, including (1) the determination whether and during what periods, if any, Flor was temporarily and/or permanently and partially and/or totally disabled as a result of her hepatitis C and (2) the apportionment of liability with respect to Flor's workers' compensation claim among the employers at risk on January 12, 1994, namely, Holguin/Pacific, Dierenfield/Travelers, and Babbitt/Pacific.

12. HRS § 386–51.5 provides:

 **Limited liability in concurrent employment.** Where an employee is concurrently engaged in more than one employment covered by this chapter and sustains a personal injury in one employment under conditions specified in section 386–3, the liability of the employer shall be limited to the benefits as would be payable had the employee no other employment than the one in which the employee was injured. The balance of the employee's benefits shall be paid from the special compensation fund, except that benefits for disability rated as a percentage of total impairment of physical or mental function of the whole person shall be the sole liability of the employer.